## CONSOLIDATED DIESEL ELECTRIC COMPANY

v.

## The UNITED STATES.

### No. 365-74.

United States Court of Claims.

April 14, 1976.

Philip M. Risik, Washington, D. C., for plaintiff; Daniel M. Ross, attorney of record. Wachtel, Wiener, Ross & Matzkin, Washington, D. C., of counsel.

Howard G. Slavit, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant.

Before COWEN, Chief Judge, and DAVIS and KASHIWA, Judges.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

KASHIWA, Judge.

Plaintiff's claim is based on contract No. F04606–70–D–0192, dated May 14, 1970, effective June 1, 1970, between plaintiff and defendant, under which plaintiff supplied required quantities of 100- and 200-kilowatt Diesel-Engine Generator sets for the Air Force.

Plaintiff's original petition was filed in this court on October 8, 1974. It later filed its amended petition on March 3, 1975. The amended petition seeks:

*In Count I* (labeled "First Cause for Relief")

A review under the standards of the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1970), of the decision of the Armed Services Board of Contract Appeals (hereafter

ASBCA) in Appeal of Consolidated Diesel Electric Company Contract No. F04606–70–D–0192, ASBCA 16826, to determine that the decision is erroneous as a matter of law and is not supported by substantial evidence.

*In Count II* (labeled "First Cause of Action")

Damages in excess of $800,000 for alleged breach of contract based on facts in the record to support Count I.

The court is requested to either remand the case to the ASBCA for negotiation or determination of the amount of the equitable adjustment pursuant to Rule 149 or to determine the damages for breach of contract pursuant to Rule 131(c).

The case is before the court on cross motions for summary judgment. For reasons hereafter stated, we allow plaintiff's motion for summary judgment with relation to its cause of action alleged in Count I of plaintiff's amended petition. Our discussion hereafter, unless otherwise indicated, relates to plaintiff's Count I request for review.

The ASBCA decision involved mixed questions of law and fact. Since the disposition of this case is based on the reasons hereafter stated, we do not deem it necessary to attempt to delineate the questions of law and fact.

The following are portions of material facts as found by the ASBCA which we deem material herein. Otherwise, they are undisputed. Bids for the subject contract were submitted by plaintiff under a procurement procedure known as "Two-Step Formal Advertising." The first step of this two-step, formally advertised procurement was initiated by Letter Request for Technical Proposal (LRFTP), issued February 14, 1969. The LRFTP specified that those engines incorporated in the technical proposals had to be qualified and listed on a Qualified Products List. Defendant claims that under the contract as finally entered into, a separate proposal was stated for each engine configuration incorporated in the technical proposal. But defendant admits that the successful bidder's proposal became a part of the contract under the LRFTP.

The proposer was required to include a detailed bill of materials. The generators with the configuration of engines involved came under a configuration management and controls program ordered by a directive of the Department of Defense, issued July 17, 1968.[1] It was a new application. Defendant admits this. The transcript of testimony before the ASBCA consists of three volumes; most of the transcript is with relation to problems arising from the new application of configuration management and controls. We shall later refer to specific, uncontradicted testimony given in the lengthy transcript and specific provisions regarding bill of materials and other relevant provisions.

The "Statement of Work," which was later incorporated in the contract, in Article 1, required the contractor to furnish all engineering, labor, tools, equipment, materials, supplies, and services necessary to design, fabricate, assemble, test, and deliver items in accordance with the requirements of Attachment A, "Purchase Description." Within thirty days after award of the contract, the contractor had to submit to the contracting officer for approval scale drawings and data to describe completely the design and assembly of the generator and excitations systems. Thirty days thereafter, the same data was to be submitted for the complete generator sets. Approval of such data would indicate that no design defects were evident but defendant argues that this in no way relieved the contractor of responsibility for supplying equipment which met the requirements of Attachment A.

The "Statement of Work" contained Attachments A through U. Attachment A, which was a detailed purchase description of the generator sets, provided:

3. REQUIREMENTS

\*    \*    \*    \*    \*    \*

---

1. This directive is more specifically referred to hereafter. It is an exhibit in this case.

3.11 *Engine.*—Except as otherwise specified in this Purchase Description, the engine shall be liquid-cooled conforming to MIL–E–11276.

Attachment L consisted of "drawings and/or part numbers for components required for use on DOD Tactical Generator Sets 15 KW through 300 KW." The engine was not listed as an Attachment L part. Any deviation from the parts listed in Attachment L required contracting officer approval.

On March 12, 1969, a pre-proposal conference was held, with representatives of plaintiff, Caterpillar, and Allis-Chalmers in attendance. An opening statement was made by an Air Force representative and it was followed by questions and answers. There were the usual questions and answers on technical matters relating to the generators. The statement covered general information and details. Printed copies of the statement and questions and answers were distributed. However, in the opening statement the Government's representative stated that the subject generator procurement was unique in that a "*formal Configuration Management Program*" on the part of both the Government and the contractor would be a "*major management discipline*" to be used throughout the contract. He admitted that this was a departure from the ordinary procurement of generators heretofore procured, but it was in accordance with recent Department of Defense directives.

On or about April 22, 1969, plaintiff sent a form letter to prospective engine suppliers asking them to furnish a technical proposal and price data in accordance with the referenced LRFTP. In addition, the form letter sought concurrence with the delivery requirements specified in the LRFTP. On April 27, 1969, plaintiff received a proposal from Caterpillar and later, a supplement. A proposal was also received from Allis-Chalmers. On or about June 2, 1969, plaintiff received price proposals from Caterpillar and Allis-Chalmers which required fur-ther negotiation before they could be accepted. Between the time it submitted its technical proposal and the time it submitted its bill, plaintiff continued to receive delivery schedule data from the vendors.

On June 29, 1969, plaintiff submitted its technical proposal to the Government.[2] It included the four 100 KW and 200 KW combinations that could be made using Caterpillar and Allis-Chalmers engines. On September 24, 1969, the contracting officer wrote to plaintiff seeking clarification of its proposal. On October 9, 1969, plaintiff submitted an amendment to the technical proposal which in part expanded on its configuration management plan.

On November 4, 1969, plaintiff received notice from the contracting officer that its technical proposal was acceptable. This was followed in January, 1970, by receipt of four bid sets, each of which made reference to one of the four engine combinations by manufacturer's name and model number as set forth in plaintiff's technical proposal.

Bids were opened on April 3, 1970. Plaintiff selected Configuration No. 1, the Caterpillar engines, for the 100 and 200 KW generator sets, subject to the provisions of plaintiff's configuration plans as disclosed in its technical proposal.

On April 9 and 10, 1970, plaintiff received notice from Caterpillar that it could meet plaintiff's requested delivery of preproduction units 220 days after contract award and delivery of completed units 500 days after release of monthly production quantities. Plaintiff did not attempt to obtain more favorable delivery dates from Caterpillar although it did not consider the delivery schedule to be satisfactory. Plaintiff felt it could obtain a better schedule when it had an offer ready for award. On April 15, 1970, Caterpillar promised a better delivery schedule, 180 to 220 days after award for preproduction units and 90 to 120 days after release of monthly production quantities for completed units. Again, plaintiff felt this schedule was not totally satisfacto-

---

2. At this point our description of plaintiff's technical proposal is brief but it is more specifically referred to hereafter in the opinion, where we recite the relevant portions of the proposal in the exact words used by plaintiff.

ry but it was hopeful for better terms after it received award of the prime contract. On April 14 and 15, 1970, a pre-award survey team met with plaintiff. Caterpillar's latest delivery schedule was acceptable to the Government's production people and the pre-award survey team.

Plaintiff was awarded the contract on May 14, 1970, effective June 1, 1970. The maximum dollar amount of the award was established for "administrative purposes only" as $31 million for three program years. The contract contained the standard General Provisions for fixed-price supply contracts including the following:

> * * * Clause 2, Changes, ASPR 7–103.2 (1958 JAN), and Clause 15, Disputes, ASPR 7–103.12(a) (1958 JAN). It also contained within the General Provisions Clause 40, Quality Program, ASPR 7–104.28 (1967 AUG); Clause 60, Correction of Deficiencies, ASPR 7–105.7(d); and Clause 65, Value Engineering Incentive, ASPR 7–104.44 and 7–104.44(c)(i) (1967 JUN).

General Provision, Clause 40, the Quality Program clause, required the quality program to be in accordance with specification MIL–Q–9858A. That specification required plaintiff to perform inspections, tests, and detailed record-keeping and also required plaintiff to decide which quality program or controls to pass on to its subcontractors.

A post-award meeting was held during the period of June 9 through 17, 1970. At that time the Government believed plaintiff could not move from the bill of materials in the technical proposal without submission of an Engineering Change Proposal (ECP). Plaintiff clearly stated that it believed that a movement from the bill was not a change in the specifications and if it was required to substitute an alternative source to meet its prime obligations, it could do so without Governmental approval. At the meeting, as a compromise, there was an agreement on the method of making engine changes under plaintiff's technical proposal. Instead of an ECP, plaintiff and the Government agreed that a Request for Technical Action (RTA) would be used. A change

from Caterpillar to Allis-Chalmers engines was discussed in reference to the RTA procedure. Plaintiff stated to the contracting officer that it wanted flexibility to choose either Caterpillar or Allis-Chalmers engines, depending upon negotiations. Plaintiff believed that the change from Caterpillar to Allis-Chalmers would be acceptable on the RTA form as the Government had found the Allis-Chalmers engines technically acceptable when it had accepted plaintiff's technical proposal. It was clear that by agreeing to submit the RTA form plaintiff was still contending that defendant's approval was not required, it was only informational, and that defendant's representatives understood plaintiff's position. When RTA forms are hereafter mentioned, their submission by plaintiff is understood to be subject to the foregoing qualification. Plaintiff advised the Government that in order to meet the 60-day drawing requirement it was going to begin preparing a design around the Allis-Chalmers engine.

On June 19, 1970, plaintiff submitted an RTA, on a draft Condec form 4306. It requested approval of the Configuration 4 Allis-Chalmers engines as alternatives to Configuration 1 Caterpillar engines. The reason given for the request was to "permit negotiations to secure subcontract in accordance with contract obligations." No action was taken on this RTA.

Three days later, on June 22, 1970, plaintiff sent a TWX, designated as RTA 4306–0001, to the contracting officer requesting approval for plaintiff to give concurrent consideration to both engine suppliers for a negotiations period of five days, at which time only one approved supplier would be selected. No action was taken on this RTA as the Government's Configuration Control Board was told it would be withdrawn.

On July 6, 1970, plaintiff sent a third RTA to the contracting officer, this time requesting a change from Configuration 1 to Configuration 4. The stated reason was that plaintiff and Caterpillar were unable to reach agreement on terms, including correction of deficiencies and delay damages, without an increase in price, while Allis-

Chalmers would meet all terms and conditions.

On July 8 and 10, 1970, the office of the Project Manager, Mobile Electric Power (PM–MEP) and the Air Force Aeronautical Systems Division, Wright-Patterson Air Force Base, both of which provided technical input for the project, recommended to the contracting officer disapproval of the latest RTA because the prime contractor was responsible for correction of deficiencies and delay damages was a matter between the prime and subcontractor. PM–MEP noted in its recommendation a revised proposal would be considered if Caterpillar had made an unwarranted increase in price over that offered prior to contract award. The Aeronautical Systems Division noted in its recommendation that the Configuration 4 engines were technically acceptable.

On July 13, 1970, the contracting officer disapproved the RTA. Thereafter, Caterpillar informed plaintiff it was preparing a new quotation and had various objections to the terms of plaintiff's purchase order. It maintained the right to make production changes after preproduction approval without plaintiff's or the Government's approval and was only conditionally accepting a Correction of Deficiencies Clause. Due to production difficulties Caterpillar could not foresee delivery before December, 1970. On July 16, 1970, Caterpillar sent plaintiff a "completely revised quotation" which superseded all previous proposals.

On July 15, 1970, plaintiff prepared a new RTA, requesting approval to utilize Configuration 4 in lieu of Configuration 1, the chief reasons being that Caterpillar would not accept MIL–Q–9858A and, further, would not furnish a delivery schedule acceptable to plaintiff. On July 24, 1970, Caterpillar agreed to a firm delivery date of December 15, 1970, for 17 preproduction units with the exception of making delivery between November 15 and December 1, 1970, if it received notice to proceed not later than July 29, 1970. On July 29, 1970,

the contracting officer disapproved the RTA. In his letter of rejection the contracting officer considered Caterpillar's proposed delivery date of December 15, 1970, to be adequate to meet the contract production delivery schedules.

After rejection of the July 15, 1970, RTA, Allis-Chalmers offered plaintiff a price reduction of up to 4 per cent of its proposed subcontract price for a waiver of MIL–Q–9858A. Plaintiff's vice president told the contracting officer that it was willing to pass on to the Government any savings realized from a change in engines. Plaintiff indicated that the savings would amount to approximately $112 per engine. The contracting officer noted that cost or pricing data would be required.

On August 6, 1970, plaintiff submitted a cost reduction ECP. Plaintiff objected to the use of an ECP believing that matters of this type would be handled by an RTA. On August 11, 1970, plaintiff forwarded cost data incident to the ECP, providing for a cost reduction of $112 per unit for the 100 KW generator sets and $248 per unit for the 200 KW sets, for a net savings to the Government of $86,332. On August 13 and 17, 1970, the Government recommended approval of the ECP. On August 20, 1970, the contracting officer disapproved the ECP.[3] Plaintiff asked for reconsideration and requested a final decision. On August 24, 1970, plaintiff notified the contracting officer it considered his August 20, 1970, TWX an order to utilize Caterpillar engines, thus denying plaintiff the opportunity of performing the contract in accordance with the contract provisions. Plaintiff stated it would comply with the contract as changed without prejudice to its right to claim a breach of contract or a constructive change.

Beginning in September, 1970, there began a debate between plaintiff and the Government, and among the various Government offices, on the acceptability of the generator sets with an engine produced by a subcontractor not utilizing MIL–Q–

---

3. The ECP was disapproved because the Government had calculated it was entitled to a reduction in the contract price in the amount of $600,000. Plaintiff responded that $112/$248 was its best and lowest offer.

9858A. The focus of the debate was the contracting officer's July 29, 1970, TWX to plaintiff wherein the contracting officer stated that configuration control of engines beyond MIL–E–11276 was not required.

In May, 1971, plaintiff's Quality Assurance Director visited Caterpillar's plant and determined Caterpillar was not prepared to implement various essential features of MIL–Q–9858A which were in excess of those required under MIL–I–45208A. Plaintiff, however, was prepared to implement a number of these features with its personnel. The Director listed ten elements of MIL–Q–9858A which he felt were essential to assurance of continued contractual conformance by plaintiff. These ten elements were considered by plaintiff to be criteria for judging a subcontractor's compliance with MIL–Q–9858A, yet Caterpillar's proposal had made no reference to most or all of these items. The Director believed that Caterpillar's unwillingness to comply with these elements of MIL–Q–9858A made it "impossible" for plaintiff to administer the contract from a quality point of view. Plaintiff could not provide objective evidence of consistently conforming material or demonstrate the parts received met the requirements of the specifications without Caterpillar's compliance.

On February 18, 1971, plaintiff advised the contracting officer it would seek an equitable adjustment for costs occasioned by being forced to utilize Caterpillar engines. On March 29, 1971, plaintiff presented its claim, with supporting documentation, in the amount of $818,305. Therein, plaintiff alleged improper interference with its performance under a performance-type contract and wrongful contract interpretation beyond the scope of the contract as awarded.

On September 8, 1971, the contracting officer's final decision denied plaintiff's claim in its entirety. Plaintiff appealed to the ASBCA. On June 26, 1974, the ASBCA rendered a decision denying plaintiff's appeal. Thereafter, on October 8, 1974, plaintiff filed its original petition in this court.

The issue involved in this case is whether plaintiff was limited to furnishing engines manufactured by Caterpillar, designated in Configuration 1, during Step 2. As used herein, Step 1 begins with defendant's distribution of the LRFTP to contractors on February 14, 1969. Step 2 begins with the bid and contract award on May 14, 1970, and ends 330 days after contract award.

As a preliminary matter we mention that both parties agree that it is a question of law whether the totality of the request for proposals, plaintiff's proposal, and the resultant contract "froze" the contract's engine specifications at the time of award. *Ray D. Bolander Co. v. United States,* 186 Ct.Cl. 398 (1968); *Jamsar, Inc. v. United States,* 442 F.2d 930, 194 Ct.Cl. 819 (1971); *Dynamics Corp. v. United States,* 389 F.2d 424, 182 Ct.Cl. 62 (1968); *Merando, Inc. v. United States,* 475 F.2d 603, 201 Ct.Cl. 28 (1973); *John McShain, Inc. v. United States,* 462 F.2d 489, 199 Ct.Cl. 364 (1972). And, therefore, the decision of the ASBCA regarding the above-mentioned interpretation is not entitled to finality. This court is free to re-examine the contract language and independently reach its own conclusion. *Dana Corp. v. United States,* 470 F.2d 1032, 200 Ct.Cl. 200 (1972); *Bishop Engineering Co. v. United States,* 180 Ct.Cl. 411 (1967); *Maxwell Dynamometer Co. v. United States,* 386 F.2d 855, 181 Ct.Cl. 607 (1967); *Randolph Engineering Co. v. United States,* 367 F.2d 425, 176 Ct.Cl. 872 (1966); *Thompson Ramo Wooldridge Inc. v. United States,* 361 F.2d 222, 175 Ct.Cl. 527 (1966).

Since in the discussion to follow plaintiff's technical proposal submitted on June 29, 1969, is discussed extensively and in detail, the question arises as to whether plaintiff's technical proposal was a part of the contract. In the instant case the LRFTP stated as follows:

   * * * The successful bidder's proposal shall become a part of the contract * * *.

Therefore, plaintiff's technical proposal was clearly a part of the contract.

At this point we discuss *Jack Stone Co. v. United States,* 344 F.2d 370, 170 Ct.Cl. 281

(1965), a case which both parties have discussed extensively in their respective briefs. We consider the case very pertinent. In that case Jack Stone Co. (hereafter Stone) entered into a contract with the General Services Administration (GSA) to modernize a fire alarm system. The existing system was of Sperti Faraday manufacture. The general conditions included in the contract specifications contained a provision, paragraph 1–19, entitled "Standard References," which stated that reference in the specifications to an item by name establishes a standard of qualify and does not limit competition. The contract also provided that the contractor may make equal substitutions if approved in writing in advance by the contracting officer. Another paragraph of the specifications stated that all new equipment and parts furnished shall be of the same manufacturer of the existing system, Sperti Faraday. After entering into the contract, Stone submitted its list of material and shop drawings showing the use of equipment manufactured by American District Telegraph Company (ADT). Stone was advised that the material did not comply with the specifications. Stone requested reconsideration. The contracting officer instructed Stone to use the Sperti Faraday equipment. Stone appealed the decision to the Administrator of the GSA and the appeal was heard by the GSA Board of Review. The appeal was denied. While the appeal was pending, Stone completed performance using Sperti Faraday products. Stone filed suit in this court seeking an equitable adjustment under the changes article because the contracting officer required Stone to install Sperti Faraday equipment rather than ADT equipment. The court decided with relation to the "Standard References" paragraph as follows:

> * * * It was designed to discourage the potentially monopolistic practice of demanding the use of brand-name or designated articles in government contract work. * * *
>
> * * * * * *
>
> * * * The contracting officer does have to exercise judgment to determine whether the item proposed to be substituted is equal in quality and performance to the designated proprietary product, but his power does not extend to a refusal to allow a replacement which is equal in these respects. * * *
>
> * * * * * *

We see no reason why paragraph 1–19 should not be accorded its ordinary meaning in the present contract. All the references in the detailed specifications to Sperti Faraday equipment can be, and should be, "interpreted as establishing a standard of quality"—as paragraph 1–19 requires. In the light of that paragraph, there is no language (such as the phrase "Sperti Faraday *only*") suggesting anything other than a "standard of quality." Nor does the record show that the contracting officer or the specification writer had any dispensation to delete or modify that standard clause or to change the policy it incorporates. If the National Institutes of Health or the Public Buildings Service desired to assure that only Sperti Faraday material would be installed, they should have taken the necessary steps to omit or change paragraph 1–19. Since the clause was included *in toto* without any expressed qualification, it must be given its normal sphere of operation. *Cf. Kaiser Industries Corp. v. United States*, 340 F.2d 322, 169 Ct.Cl. 310, 323–24 (1965); *Pfotzer v. United States*, 77 F.Supp. 390, 399–400, 111 Ct.Cl. 184, 226 (1948), *cert. denied*, 335 U.S. 885, 69 S.Ct. 237, 93 L.Ed. 424 (1948); *Loftis v. United States,* 76 F.Supp. 816, 826, 110 Ct.Cl. 551, 629 (1948). [Footnote omitted.] [344 F.2d 373–75, 170 Ct.Cl. 287–88.]

In *Jack Stone Co.* we held under the circumstances in that case that specific references in a contract to a brand name, Sperti Faraday, only established a standard of quality and that a product of equal quality manufactured by American District Telegraph, may be substituted. Plaintiff relies on *Jack Stone Co.* and claims that under all the circumstances of this case, with relation

to engine combination, the combination by Caterpillar first designated by plaintiff did not preclude later substitution of the Allis-Chalmers engine combination since both engines were on defendant's Qualified Products List.[4]

We now discuss an important aspect of this case which the ASBCA chose not to decide. The ASBCA stated as follows in its decision at footnote 4:

> There has been considerable argument over whether appellant submitted one technical proposal with four engine combinations, or four separate technical proposals. However, a determination of one or the other is not necessary to the outcome of this decision. Only one part or source could be placed in a bill of materials list for each item, and the instructions to the Letter Request for Technical Proposal stated that a separate proposal was necessary for each engine incorporated. Appellant felt it needed a separate proposal for each engine (Tr. 1–67). For ease of reference, we will describe appellant's 29 June submission as its "technical proposal", with four engine configurations.

A relevant portion of the technical proposal submitted by plaintiff to the Government on June 29, 1969, stated in regard to selection of the 100 KW and 200 KW engines as follows:

> We have included separate engine proposals as permitted by paragraph III of LRFTP.
>
> We have included in Section 8.4 two possible engine selections for each of the 100 Kilowatt and 200 Kilowatt size units.
>
> We have described in Section 8.7 our selection of Major Components for this Program.
>
> The separate engine proposals we are making are in accordance with the instruction and explicit understanding of the Letter Request for Technical Proposal.

The separate engine "family" proposal possible combinations are:

> (1) Cat. Model D33T—100 KW and Cat. Model D343TA—200 KW.
>
> (2) Cat. Model D333T—100 KW and Allis-Chalmers Model 25000—200 KW.
>
> (3) Allis-Chalmers Model 11000—100 KW and Cat. Model D343TA—200 KW.
>
> (4) Allis-Chalmers Model 11000—100 KW and Allis-Chalmers Model 25000—200 KW.

> The final choice of the engine "family" combination to be utilized in Step II of this procurement will be made by Con-Diesel based on qualification status at that time and other pertinent engine factors. [This clause will be hereafter referred to as plaintiff's "option clause."] [Footnote omitted.]

Plaintiff proposed four engine combinations with plaintiff's option clause because it wanted to maintain the widest possible latitude, to enable it to get the best price prior to its submission on Step 2. On September 24, 1969, the contracting officer wrote plaintiff, seeking clarification of plaintiff's proposal on various points, including baseline control during the development cycle and the control of baselines through configuration management. On October 9, 1969, plaintiff submitted its "Amendment" to the technical proposal, which, in part, expanded on its "configuration management plan." Plaintiff points to statements in Section 4 of the amendment as providing the primary contractual basis for its freedom to furnish either Caterpillar or Allis-Chalmers engines. Section 4 provided:

> *Baseline Control*
>
> During the development cycle the Project Engineer is responsible for initiating changes to the design drawings, in accordance with changes generated by the testing program, and manufacturer of first articles. These changes will take the form of engineering drawing releases or drawing changes, which will be reviewed by the CCB[5] to insure compliance

---

4. See, also, *Meva Corp. v. United States*, 511 F.2d 548, 206 Ct.Cl. 203 (1975).

5. Plaintiff's internal Configuration Control Board. [Footnote added by the court.]

with specification and contract requirements.

As indicated in the "Schedule of Engineering Data Submittal" Chart in Section 2.11, our Company will commence submitting drawings for Government approval 220 days after Contract Award. The last drawings are scheduled to be submitted 330 days ARO [after contract award]. However, any design changes occurring between the 330 day to 420 day period will require ECP's [Engineering Change Proposal] to be submitted to the Government for approval.

All design drawings will be under control of the CCB from the preparation of the first drawing to the time of production release by the Government (550 days ARO), and continuing to completion of the program.

We think that the ASBCA erred in refusing. to decide as a preliminary issue whether plaintiff's technical proposal was one technical proposal with four engine combinations or four separate technical proposals. The ASBCA eviscerated plaintiff's option clause from the bowels of the main controversy in this case. Plaintiff's option clause in its technical proposal read as follows:

The final choice of the engine "family" combination to be utilized in Step II of this procurement, will be made by Con-Diesel based on qualification status at that time and other pertinent engine factors.

Plaintiff's option clause would be nullified if plaintiff's technical proposal is interpreted as four separate technical proposals. If a list of items to be chosen by option is separated and each item is considered as being separate, the option becomes meaningless. Therefore, plaintiff's option clause would be viable only if plaintiff's proposal is interpreted as one technical proposal with four combinations. For then there is a list of four combinations from which plaintiff may choose. It was vital to the main issue in this case for the ASBCA to decide the question whether the technical proposal was one technical proposal with four engine combinations or four separate technical proposals. But the ASBCA stated that the determination was not necessary because:

\* \* \* Only one part or source could be placed in a bill of materials list for each item, and the instructions to the Letter Request for Technical Proposal stated that a separate proposal was necessary for each engine incorporated. \* \* \*

The ASBCA in deciding preliminarily that a determination was not necessary did not consider the portion of defendant's LRFTP which stated that the successful bidder's technical proposal "shall become a part of the contract." If plaintiff's technical proposal as submitted was one technical proposal with four engine combinations, plaintiff's option clause became a part of the contract. The ASBCA by choosing not to decide whether plaintiff's proposal is one proposal with four engine combinations or four separate proposals in effect deprived plaintiff of its rights under the option clause because as hereafter shown, plaintiff's technical proposal was clearly one proposal with four engine combinations.

Was plaintiff's technical proposal one proposal with four engine combinations or four separate technical proposals? In framing the alternatives, we believe that the ASBCA abbreviated the alternatives and it really meant the following: Was plaintiff's technical proposal one proposal of four engine combinations *with plaintiff's option clause* or four separate proposals?

In deciding the question we deem it pertinent that after plaintiff's technical proposal was received by the Government, plaintiff was notified that a clarification was required. The clarification was requested under the following section of defendant's LRFTP:

J. Technical proposals submitted in response to this request should be fully and clearly acceptable without additional explanation or information, since the Government may make a final determination as to whether a proposal is acceptable or unacceptable solely on the basis of the proposal as submitted and proceed

with the second step without requesting further information from any offeror; however, if the Government deems it necessary to obtain sufficient acceptable proposals to assure adequate price competition in the second step or deems it otherwise desirable in its best interest, the Government may, in its sole discretion, request additional information from any offerors of proposals which the Government considers reasonably susceptible of being made acceptable by additional information clarifying or supplementing but not basically changing any proposal as submitted, and for this purpose the Government may discuss any such proposal with the offeror.

Therefore, defendant had doubts as to what plaintiff's technical proposal meant. Paragraph J permitted this explanatory procedure only "to assure adequate price competition * * * or deems it otherwise desirable in its [the Government's] best interest, * * *." Since this was the first time the Air Force Mobile Electric Power unit applied configuration management principles to a generator procurement procedure and the Government's LRFTP did not give any guidelines, the "Baseline" descriptions in Section 4 of plaintiff's clarification were critical. This Section 4 clarification was the only place in all of the papers leading to the contract where baseline description, usually associated with configuration management and control, was described. After reading Section 4 the Government must have concluded that price competition was preserved to its satisfaction and that it was desirable and in the Government's best interest. Plaintiff's "Baseline Control" explanation in Section 4 clearly explained what plaintiff meant in its technical proposal by its option clause. Defendant cannot now be heard to say that it misunderstood what plaintiff meant because defendant's LRFTP further provided as follows:

H. If an offeror submits an unacceptable technical proposal under step one, he will be so notified in writing upon completion of the technical evaluation.

Instead of rejecting plaintiff's technical proposal, defendant approved the proposal. Acceptance of plaintiff's technical proposal was significant in that defendant's LRFTP also provided as follows:

G. In the second step of this procurement, only bids based upon technical proposals *determined to be acceptable* under step one will be considered for award, and each bid in the second step must be based on the bidders' own technical proposals. [Emphasis supplied.]

In other words, the *accepted technical proposal* became the basis of plaintiff's bid. Plaintiff submitted its bid based on its technical proposal approved by defendant. It was awarded the contract on May 14, 1970, effective June 1, 1970.

Having fully explained the circumstances relating to defendant's acceptance of plaintiff's technical proposal and plaintiff's bid based thereon, we return to the question of whether it was one proposal of four engine combinations with plaintiff's option clause or four separate proposals. Defendant's reason for arguing that plaintiff's technical proposal amounted to four separate proposals is defendant's LRFTP Instructions for Preparing Technical Proposals, dated January 28, 1969. It argues that the said instructions contained the following provisions:

I. GENERAL [paragraph 5, page 1]

The successful bidder's proposal shall become a part of the contract, and, therefore, all lists of materials and statements made in the proposal shall become binding on the contractor and shall not be altered without prior approval of the Contracting Officer.

\* \* · \* \* \* \*

III. TECHNICAL APPROACH [paragraph 1e, page 4]

Include a detailed bill of materials for each class, mode, and size of preproduction set covered by the RFTP, listing all parts by name, part number, and manufacturer. The applicable division within a company shall be indicated for those manufacturers having a corporate structure. Only one source shall be listed for

each part. The parts shall be arranged in descending order of assemblies, subassemblies, and components. Standard hardware, such as fasteners, screws, nuts and bolts, need not be listed. These lists in no way affect nor do they substitute for any listings required by a contract resulting from this RFTP.

Amendment No. 2 to the LRFTP, dated April 9, 1969, at Section III, page 4, stipulated:

Proposers may submit proposals based upon engines in either or both these categories. A separate proposal is necessary for each engine incorporated and only one proposal for each of the above categories may be submitted.

Defendant argues that under the above provisions, since each engine combination is a separate proposal, prior consent of the contracting officer must be obtained before other engines are substituted for engines manufactured by Caterpillar.

Plaintiff's answering argument is that plaintiff bid to its accepted technical proposal with the incorporation of the Caterpillar engine into its material list completing its bill of material list in Step 1. Only by going to that material list with the Configuration 1 designation could anyone determine the engine selected. The plaintiff's technical proposal had been accepted by the contracting officer on this basis. The contract provisions incorporated into the contract and as set forth in Step 2 clearly did not require that the contractor utilize the specific engine set forth in the material list, unless the engine was included in approved drawings accepted by the contracting officer 330 days after receipt of order. In short, plaintiff relies on its option clause as clarified by it in Section 4 of the baseline clarification heretofore quoted in full. This was all a part of the configuration management proposal incorporated into plaintiff's technical proposal. The configuration management proposal was a requirement defendant specifically requested to be incorporated in the technical proposal. Plaintiff strongly argues that defendant cannot ignore it because it is binding on plaintiff as a part of the contract, so it is also binding on defendant.

So the question is, what is controlling? The provisions cited by defendant or plaintiff's option clause in its technical proposal, as further clarified by Section 4 of plaintiff's clarification heretofore quoted?

Plaintiff also clarifies the following amendment to the LRFTP which defendant contends is also material:

Proposers may submit proposals based upon engines in either or both these categories. A separate proposal is necessary for each engine incorporated and only one proposal for each of the above categories may be submitted.

Plaintiff states that the amendment is of no significance in arriving at the plaintiff's intent in submitting alternative engine selections. The above merely permits offerors to submit multiple technical proposals respecting engines. Plaintiff argues that although defendant contends that the plaintiff submitted and was offered the opportunity to bid against four technical proposals, that is not precisely what occurred. Plaintiff's argument is that it submitted one technical proposal with four alternate engine selection combinations. The plaintiff's proposal contained one bill of material list showing each part that goes into each of the generator sets involved, with differences, if any, noted on the list between the different sets. There was only one part allowed in the bill of material for each item, including the engine. There was no separate complete bill of material submitted for each of the four different engine combinations. Where the engine was set forth in the list, the description of material column showed the words "See Proposal Section," which referenced the four different combinations set forth in the proposal. In effect, the plaintiff says it submitted one technical proposal with four different engine combinations.

Plaintiff has also presented the following additional reasons to show that its position that the technical proposal was a single proposal with four engine combinations with plaintiff's option clause, which allowed

plaintiff to substitute engines during the Step 2 period, is correct:

1) Defendant's request for proposals stated very clearly that defendant desired inclusion in the generator sets of an engine which conformed to a certain specification (MIL–E–11276) and which was liquid-cooled. The only restriction was that the engine selected by the contractor must be one which had been qualified and was included on a certain Qualified Products List (QPL). There were engines on the QPL manufactured by three companies, including Caterpillar and Allis-Chalmers. The foregoing language leads to the conclusion that (a) defendant was satisfied with any one of the engines listed and manufacturers listed and (b) the choice was entirely that of the contractor.

2) Defendant contemplated that prospective contractors would desire to leave open their options with regard to which of the functionally interchangeable engines would be included in the generator set. This contemplation is evidenced by the permission extended in the request for proposals allowing prospective contractors to submit a proposal with separate engine proposals. This was defendant's way of being informed about the alternates proposed.

3) There is no explanation in the record of why defendant sent four separate invitations for bids to plaintiff (in Step 2), each differing only with regard to the engine combinations selected as alternates by plaintiff. Defendant has never argued that this was for the purpose of "freezing" the engine choice at the time of award. Nor is this a logical antecedent purpose, considering that the preproduction testing cycle was programmed for more than 550 days. This was much more than ample time to switch engines three or four times, *particularly* when the engines were designated by manufacturer and part number in the QPL. These were tantamount to off-the-shelf items.[6]

4) The request for proposals included an Attachment L. On Attachment L there was a list of components by make and part number. There was also a provision that no substitute makes or part numbers could be used without advance approval of the contracting officer. If there were some reasonable excuse for wanting to freeze the engine part number at the time of award (proposal, really), it would have been a simple matter for defendant to include the engine in Attachment L, or provide that after prospective contractors elected an engine, the make and part number would be considered to be included in Attachment L. The engine was *not* included in Attachment L.

5) The only control on the change in the engine in the contract was after design drawing approval 330 days after contract award, as was incorporated in the following paragraph of the Statement of Work:

"aa. The Government recognizes the necessity of making production changes to QPL engines after the prototype generator sets have been tested, accepted and released for production. To insure set compatibility, the Government reserves the right to review, approve, or disapprove such changes prior to their incorporation in production engines. If the engine is subcontracted, prior to award of the subcontract, Government approval of the subcontract is required to insure that the requirements herein have been included."

6) The question arises, did anything become "frozen" with respect to the engines at the time of award of the prime contract? The contract price for the generator sets became frozen. Thereafter, having assumed 100 per cent of the cost-risk, as contractors do in firm fixed-price contracts, plaintiff could not change its mind about the engine at the defendant's expense. In other words, plaintiff could select another conforming engine but it

---

6. With relation to the four bid sets sent to plaintiff by defendant, plaintiff adduced testimony that it would not be advisable to put in more than one bid, meaning that it would be self-defeating to put in four bids. Defendant has not answered this testimony at all.

could not demand that the defendant pay any increased cost resulting from the switch. By the same token, the price being frozen, the defendant is not entitled to any contract price reduction if a conforming engine other than that mentioned in the award document is used.

At this point we refer to the testimony of Joseph Sullivan, defendant's chief witness. We deem his testimony material. He stated that he was employed at Fort Belvoir and worked for the Department of Defense as Project Manager, Mobile Electric Power (MEP) unit. His position was Chief of the Configuration Management Division. He was also Chairman of the Configuration Control Board of the MEP unit. He was graduated in 1915 as a geological engineer from the Colorado School of Mines. He spent most of his early years as an engineer in the oil business, including considerable time in Venezuela as an employee of Gulf Oil Company. He returned from his Venezuelan assignment in 1968 to the Virginia area and started working for defendant's MEP unit. He was in charge of the standardization program, especially in the area of documentation in the Project Manager's office. He had no prior experience as a contracting officer. He took a short six-months leave to work with the Advanced Material Concepts Agency. This was from January through July, 1969 (the LRFTP was sent out by defendant on February 14, 1969; pre-proposal conference was held on March 12, 1969; plaintiff's technical proposal was submitted on June 29, 1969). After returning from the said agency assignment, he assumed the position as Chief of the Configuration Management office. It appears that while he was away with the said agency, there was a decision to apply configuration management and control to the project involved in this case. He testified that in addition to the machines developed in this case, there were other smaller sets to which configuration management was to be applied so there was much work to be done. When asked whether any instructions or information were disseminated to prospective bidders regarding the configuration management control, he answered as follows:

> Yes. There were two things. The problem really presented to us was one of "How do you get this information across to the contractors?" This is difficult. This is a formal system. Configuration management in our parlance was new.
>
> This was a new approach to configuration management, that is, at the DOD level. It had never been done this way before. * * *

He testified that Colonel Rochfort informed the bidders regarding configuration management at the pre-proposal meeting. The Colonel's remarks and the questions and answers which followed with relation to configuration management and control are given in the margin.[7] He admitted that

7. The material portions of Colonel Rochfort's instructions and questions and answers were the following:

In the instructions:

"I would like to take this opportunity to very briefly address four areas which we are putting a great deal of emphasis on in this procurement. These areas are: reliability; quality assurance; *configuration management;* and maintainability. We have departed from the normal engine generator procurement in these areas because we feel that additional effort must be expended if we are to have the type sets the DOD needs. [Emphasis supplied.]

"*In the category of configuration management,* we are requiring a formal Configuration Management Program on the part of both the contractor and the Government and this will be a major management discipline to be used throughout the contract. This Configuration Management Program is *truly unique in the procurement of engine generator sets and deserves considerable attention being given to this* effort in the submission of your RFTPs. Emphasis will be placed during our evaluation on how you propose to establish and administer your program. Your attention is invited to the following specific requirements which must be included in your submission. [Emphasis supplied.]

"First, you must relate to the Contracting Officer your understanding of the Configuration Plan. Your plan must recognize a system to provide for prompt detection of potential configuration discrepancies or incompatibilities as well as for effecting timely corrective action.

"Your Configuration Control Board must be chaired by a responsible company official.

configuration management control as applied to engine generators was new and that they were testing the configuration control programs as applied to generators about the time the LRFTP was issued in this case on February 14, 1969.[8] The procedures were developed in a very informal manner. He stated that the LRFTP issued in this case did not state that the bidder had to meet any particular specification with respect to configuration management or control. He admitted that there was a guideline document under which defendant operated, called Mil Standard 480, which provided as follows:

"Your plan must clearly identify the organizational elements within your firm that will be influenced by configuration management prior to preparation of the flow chart for the Configuration Control Board functions.

*"Most importantly, your plan must show that the procedures you intend for control of your subcontractors and vendors. Basically, your subcontractors must be subject to the same depth of control by you as you will be by the Government. As I mentioned before, this is new to generator procurements but is completely in accordance with recent DOD directives and instructions on this subject."* [Emphasis supplied.]

In the questions and answers:

Q. "Will a material review board (as defined in ASPR) be considered in a contract resulting from an acceptable proposal?

A. "Yes. A review board will be considered in conjunction with configuration management of the contract.

Q. "What does the Government's management plan for this procurement consist of?

A. "Contract management will be in accord with the current procedures in effect for the Military Services. Technical management will be in accord with the finalized Configuration Management procedures, which will be forthcoming from this RFTP.

Q. "What company or companies can supply the required technical information within the required time frame of this RFTP?

A. "The information cannot be supplied at this time.

Q. "Clearly define the implication and meaning of 'The Government will exercise design control * * *.'

A. "Design control will be via configuration management procedures. The Government considers the intent to be clear. Specific questions will be entertained."

8. Department of Defense Directive 5010.19, issued July 17, 1968, relating to configuration management and consisting of eight pages with

Contracts invoking this standard will specifically define base line, documentation and change control requirements consistent with the scope of the program and the complexity of the item being procured.

When asked where in the contract was there any reference to an allocated baseline, he answered that it was only in plaintiff's technical proposal. He testified as follows:

Now, within the contract, when you are looking for the requirements for control, configuration control, what you have to do is to be able to identify those sections which actually cover configuration man-

a three-page attachment, described configuration management as follows:

"B. *Configuration Management.* A discipline applying technical and administrative direction and surveillance to (1) identify and document the functional and physical characteristics of a configuration item, (2) *control changes to those characteristics,* and (3) record and report change processing and implementation status." [Emphasis supplied.]

With relation to procurement aspects, it read:

"7. *Procurement Aspects.* DOD Components shall assure that appropriate provisions for configuration management are included in all contracts (or equivalent in-house agreements) for the development, production, modification and maintenance of CI's [Configuration Item]. Procurement planning and contract practices must be responsive to configuration management requirements."

It provided that each Department of Defense Component "shall implement this Directive within 90 days [by October 17, 1968] and shall forward three (3) copies of each implementing document to the Director of Defense Research and Engineering and to the Assistant Secretary of Defense (Installations and Logistics)."

In accordance with the directive, a "Joint Operating Procedure, Management and Standardization of Mobile Electric Power Generating Sources," dated March 30, 1970, consisting of 27 pages taken out of a looseleaf type of book, was developed and Chapter 7 therein related to "Configuration and Data Management." This document is in evidence as an exhibit. Witness Sullivan constantly referred to this Chapter 7 in his testimony before the ASBCA in September, 1972. It is significant that the LRFTP in this case was issued February 14, 1969; plaintiff filed its technical proposal on June 29, 1969; and the clarification was sent by plaintiff to defendant on October 9, 1969. Bids were opened on April 3, 1970.

agement, or the aspects insofar as configuration control is applied to specific parts within the generator sets themselves.

Now, starting from the beginning of the document, of course, the first one, and most important to us, is putting the technical proposal itself in the contract. *When that occurred, the configuration management description that the contractor had prepared in response to the LRFTP became part of the contract.* This includes the definitions that we are trying to talk about. [Emphasis supplied.]

\* \* \* \* \* \*

Q. Where else in the contract do you feel that it states that the contractor's technical proposal is part of a designated base line in that contract?

A. *Those specific words don't appear in the rest of the contract.* Except for that paragraph, those words don't appear. [Emphasis supplied.]

And with relation to configuration controls on engines, he testified:

Q. If configuration was so important in your program prior to that point, why did you not require that control be put on the engine before the period that the engines were tested or incorporated or approved?

A. You have to go back to the section of the QPL engine and the QPL document, and what it contains. If I had the document, I think I could demonstrate a little more easily than trying to describe it.

But essentially, what happens is, when an engine is QPL, the Government and the contractor together select a series of critical components and they publish the list of critical components within the QPL document itself, such as the QPL describes the engine and its characteristics, and then right behind that a complete listing of all those items that are critical insofar as the operation of that engine is concerned.

*Consequently, the control on a QPL engine which the Government exercises is the control provided by the QPL at that stage, so the control was there. We didn't have to do anything. It came with the engine.* [Emphasis supplied.]

We shall later refer to the foregoing answer regarding engine control.

Defendant argued that the "NOTICE" provision provided that it was plaintiff's contractual obligation to provide Caterpillar engines and no others. That provision refers to equipment to be furnished in accordance with Configuration 1 and assumes that there are four separate configurations. Defendant states that the Government has a right to insist on the materials specified. Defendant refers to cases cited by the Government in *Jack Stone Co. v. United States, supra,* for the proposition that the Government is entitled to get what it contracts for. *Farwell Co. v. United States,* 148 F.Supp. 947, 137 Ct.Cl. 832 (1957); *Henry Spen and Co. v. United States,* 153 F.Supp. 407, 139 Ct.Cl. 613 (1957); and *Octagon Process, Inc. v. United States,* 141 Ct.Cl. 599 (1958). This court considered these cases inapposite in *Jack Stone.* We also consider them inapposite in the instant case. Defendant relies mainly on the LRFTP Instructions for Preparing Technical Proposals and "Technical Approach" paragraphs which we have heretofore recited in the earlier part of this opinion. It also relies on statements by some of plaintiff's witnesses that there were four proposals. But contracting officer Jack Metz, one of defendant's chief witnesses, also testified that plaintiff submitted "under one proposal or under one cover a variation of engine configurations." We do not deem it decisive whether one witness or another, whether plaintiff's or defendant's, used the plural or singular in testifying about the proposal because the very nature of the present procurement involved four engine configurations, with each configuration itself involving two separate engines. There were sub-proposals in a proposal. It was difficult to draw a line between singular and plural under the circumstances of this case, when discussing proposal, proposals, engine, engines, configurations, and combinations.

We base our decision on more substantial reasons.

We think it is important in deciding this case that it is undisputed that the MEP unit of the Air Force involved in this case was attempting to incorporate new concepts, configuration management and controls, in the present procurement of generators, in accordance with a Department of Defense directive issued in July, 1968. It was the first time the MEP unit applied configuration management and controls to this type of procurement. The "parlance was new," as chairman Joseph Sullivan of the unit's Configuration Control Board testified. In early 1969 application of configuration management and controls to the present type of procurement was still in the experimental stage. Defendant's MEP unit was clearly not ready for such application. This was apparent at the time of the meeting of prospective bidders when the LRFTPs were issued. Colonel Rochfort stated in his questions and answers that the configuration control procedures will be forthcoming. On the other hand, bidders were told that there would be configuration management and controls involved in the contract and that these controls were one of the important factors to consider in the present procurement. But the contractors at the meeting were not given anything specific. It is a difficult concept even with guidelines.[9] Instead of providing guidelines for configuration management and controls in its LRFTP in the present case, the Government mailed its LRFTP without any mention of configuration management or control requirements. Colonel Rochfort's scant information supplied was clearly inadequate. Chairman Sullivan admitted that he did not read the LRFTP before it was sent out because he was at another agency for six months. The evidence does not disclose whether anyone carefully checked the LRFTP, which included by reference the two provisions defendant relies on for possible conflicts with the configuration management and controls proposed. Chairman Joseph Sullivan and contracting officer Jack Metz, defendant's only witnesses, who testified with relation to configuration management and controls, admitted that after the bids were in and the contract let out to plaintiff, the only place in the entire contract (which includes the LRFTP and plaintiff's technical proposal and bid) where any specific mention of configuration management and controls was made was in plaintiff's technical proposal and in its clarification. The material portions are as follows:

The *final choice of the engine "family" combination to be utilized in Step II of this procurement, will be made by Con Diesel based on qualification status at that time and other pertinent engine factors.* [Emphasis supplied.]

And in the clarification:

*Baseline Control*

During the development cycle the Project Engineer is responsible for initiating changes to the design drawings, in accordance with changes generated by the testing program, and manufacture of first articles. These changes will take the form of engineering drawing releases or drawing changes, which will be reviewed by the CCB [10] to insure compli-

---

**9.** Configuration management is referred to in the introduction of an Air Force publication entitled "Configuration Management Practices for Systems, Equipment, Munitions and Computer Programs," dated December 31, 1970, as follows:

"3.1 *Introduction.* Configuration management is a discipline applying technical and administrative direction and surveillance to (a) identify and document the functional and physical characteristics of a configuration item, (b) *control changes to those characteristics,* and (c) *record and report change processing and implementation status.* Configuration manage-

ment is thus the means through which the integrity and continuity of the design, engineering and cost trade-off decisions made between technical performance, producibility, operability, and supportability are recorded, communicated, and controlled by program and function managers." [Emphasis supplied.]
The publication in 119 pages further defines and provides for its application. This publication is not in evidence but we take notice of it as a public document.

**10.** Plaintiff's internal Configuration Control Board. [Footnote added by the court.]

ance with specification and contract requirements.

As indicated in the "Schedule of Engineering Data Submittal" Chart in Section 2.11, our Company will commence submitting drawings for Government approval 220 days after Contract Award. The last drawings are scheduled to be submitted 330 days ARO [after contract award]. However, any design changes occurring between the 330 day to 420 day period will require ECP's [Engineering Change Proposal] to be submitted to the Government for approval.

All design drawings will be under control of the CCB from the preparation of the first drawing to the time of production release by the Government (550 days ARO), and continuing to completion of the program.

We have fully considered the circumstances under which defendant accepted plaintiff's technical proposal. Plaintiff was awarded the contract. The configuration management and control provisions above quoted became a part of the contract. There are six reasons given by plaintiff why it had a right to choose engines in Configuration 4 (Allis-Chalmers) during Step 2. We fully agree with plaintiff and find that the reasons are cogent. We also find that defendant's chief witness Joseph Sullivan's admission, heretofore recited in length, that *"the control on a QPL engine which the Government exercises is the control provided by the QPL at that stage, so the control was there. We didn't have to do anything. It came with the engine."* [Emphasis supplied.] is highly prejudicial to the defendant. Witness Joseph Sullivan's admission is that of the chairman of the Configuration Control Board having jurisdiction over the present procurement and Chief of the Configuration Management Division of the MEP unit. He referred to himself as the chairman who is "judge and jury and I am the judge and jury in this case." We do not take his statement regarding engine control lightly. His admission clearly corroborates plaintiff's position taken in this case that configuration management and control provisions with plain-

tiff's option clause in its technical proposal and clarification thereof above quoted gave plaintiff a choice of engines to substitute. The chairman's said admission also strongly corroborates the six reasons plaintiff submitted in support of its position. We have listed the six reasons heretofore in this opinion.

We are also aware and consider important the query raised by plaintiff's witness that if defendant's interpretation that there were four separate proposals is correct, would any contractor bid four separate proposals? Plaintiff suggests that as a practical matter a single bidder submitting four bids would then be competing against itself. The four bids would be self defeating. Although raised in the record of this case, this query has remained unanswered by defendant. In other words, the defendant's four-separate-proposals view results in a highly impractical and self-defeating interpretation. Furthermore, plaintiff's witness Howard Weissman testified as follows:

Q. Why didn't CONDEC submit more than one proposal in the second step and why didn't CONDEC submit a bid for more than one of the acceptable engine configurations in the second set.

A. There were two reasons. One we felt that only one could be the lowest responsive bid.

Two, we discussed this problem with the CO, who pointed out a background of heavy protest action on all of these generator contracts. He suggested and I took the advice to submit a clean with nobody coming in otherwise they would never be able to award any contract under this program of family generator program.

The "CO" was identified as Mr. Metz, the contracting officer in the present case. Mr. Metz, who took the witness stand thereafter, did not deny the foregoing testimony. It meant that defendant's interpretation of four separate bids by plaintiff might lead to lawsuits by protesting bidders. Here again, the opinion of the contracting officer cannot be ignored. We can picture the confu-

sion four bids would cause because plaintiff would still insist on a right of substitution with each bid under its option clause in the technical proposal.

We also find that the development of the informal RTA form on plaintiff's "Condec" forms by plaintiff's witness Weissman and defendant's representatives was evidence that engine changes did not come under the ECP and that an ECP was not required. The undisputed testimony by witness Weissman was as follows:

At that point Mr. Sullivan who was the configuration manager for the project manager's office asserted that in his opinion we could not move away from the bill of materials contained in our technical proposal without submitting an ECP.

My contention was that there was no change in specifications. I contended that we had a prime responsibility to satisfy the terms of our obligations under the contract and while we would try to meet our obligations with our selected sources, if at any time we were required to move out to an alternate source of supply we should be able to do it without securing government approval.

This of course raised a considerable argument. I posed the question to Mr. Metz, if the government was insisting that we were to design this item strictly adhering to our technical proposal and even if our technical proposal contained components that were not designed or components that could not perform was he at that time stating that the government was adopting our technical proposal as part of the specification.

He indicated not at all. He contended that the contractor was responsible for the performance specification. So therefore I contended I should have the full and free right to move in the direction of trying to comply with the specifications without securing government approval or government direction of which way I would secure the objective of meeting the specifications.

At this point in time the government apparently caucused. *They came back with a conversation wherein Mr. Sullivan indicated that he required knowledge of where we were moving from our technical proposal so that he could record the movements of the parts from our technical proposal to what ultimately would be the product base line.*

We agreed as an accommodation that we would pass on to him the same kind of information that was moving internally from the point of view of our own internal configuration control and that we would provide it in the form of an RTA.

We specifically distinguished the form and called it an RTA since we did not accept the fact that it could be considered an ECP since we did not recognize that a change in specification was taking place.

What we were doing we were attempting to meet the specification. *At that point in time the government, Mr. Sullivan, Mr. Kramer, the technical personnel present, Mr. Metz agreed that the RTA would be the document wherein we would advise the government what we were doing in the way of changing parts to meet the specification.*

A. It was agreed that this would be an informational type no cost document. I had only one last item that I had to get cleared. And I asked Mr. Metz what would be the criteria for acceptance of an RTA.

The answer that was given was provided the item that you were substituting met the performance requirements and was technically acceptable to the government. There had been no reason why such RTA would not be approved.

I then posed a question to Mr. Kramer, *"since the engine namely, the Allis-Chalmers engine as well as Caterpillar engine had previously been submitted to the government for technical evaluation since the government had accepted it technically, I guess there was no reason why I could not be approved to substitute the Allis-Chalmers engine in the event that I could not get an acceptable subcontract from Caterpillar.*

*It was generally agreed that there were no technical exceptions to Allis-Chalmers since they had already been approved.*

*We were advised to submit this RTA as quickly as possible. It was our impression, all parties to the contract were of the impression that we would have no difficulty in securing approval of the government.*

Q. Are those same people in this room today?

A. Yes, they are.

Q. Who is it [sic]?

A. Mr. Metz was there; Mr. Guthrie was there. Mr. Sullivan was there. Mr. Kramer was there. I don't know about the others.

[Emphasis supplied.]

Witness Joseph Sullivan testified with relation to the RTA form that he agreed with witness Weissman's description that it was informational. Witness Weissman's testimony was not contradicted by any of the parties present at the time of the conversation. We find that the reasons given for the adoption of the RTA form and its use and acceptance by all concerned, including the contracting officer, show that the obtaining of consent to the changing of engines from one configuration was really not necessary. Otherwise, the official ECP forms would have been necessary. It all, again, substantiates plaintiff's position that no consent to the change was necessary.

We, therefore, answer the question we have asked. Was plaintiff's technical proposal one proposal of four engine combinations *with plaintiff's option clause* or four separate proposals? It is our opinion that plaintiff's technical proposal was *one proposal of four engine combinations with plaintiff's option clause.* Plaintiff's configuration management and control plan spelled out in its technical proposal and the clarification was incorporated into the contract. The contract did not require that the contractor utilize Caterpillar manufactured engines, as set forth as Configuration 1, exclusively. It had the option of utilizing the remaining engine combinations, 2, 3, or 4 during the Step 2 period.

Having answered the question, we now turn to the following LRFTP Instructions for Preparing Technical Proposals:

I. GENERAL [paragraph 5, page 1]

The successful bidder's proposal shall become a part of the contract, and, therefore, all lists of materials and statements made in the proposal shall become binding on the contractor and shall not be altered without prior approval of the Contracting Officer.

Defendant relies on the words *"shall not be altered without prior approval of the Contracting Officer"* and states that consent is required to substitute the Allis-Chalmers engine combination in Step 2.

To answer defendant we first refer to *Jack Stone Co. v. United States, supra.* We have heretofore discussed the case in detail to draw an analogy to this case. The present case is a stronger case in that both combinations of engines, Caterpillar and Allis-Chalmers, were on defendant's Qualified Products List.

We also answer defendant by the *contra proferentem* rule. We construe paragraph 5 above mentioned against the defendant. It was the defendant who drafted it. In *United Pacific Insurance Co. v. United States,* 497 F.2d 1402, 1407, 204 Ct.Cl. 686, 695 (1974), we stated as follows:

\* \* \* The Government as drafter of the contract had a duty to shoulder the major task of seeing within a zone of reason that words of the contract correctly and concisely communicate the proper notions and intentions of the parties, and the Government must bear the burden of a failure to carry that responsibility. *L. Rosenman Corp. v. United States,* 390 F.2d 711, 182 Ct.Cl. 586 (1968). The Government drafted this contract and as a result, any ambiguities that were created should be strictly construed against the Government. *Merritt v. United States,* 95 Ct.Cl. 421 (1942); *Wunderlich Contracting Co. v. United States,* 166 F.Supp. 741, 143 Ct.Cl. 876 (1958).

The following recent cases are in accord: *H & M Moving, Inc. v. United States,* 499 F.2d 660, 671, 204 Ct.Cl. 696, 716 (1974); *Max Drill, Inc. v. United States,* 427 F.2d 1233, 192 Ct.Cl. 608 (1970); *Sturm v. United States,* 421 F.2d 723, 190 Ct.Cl. 691 (1970). Accordingly, our construction of paragraph 5 is that, with relation to the word "contract" used in the paragraph, we construe it to include plaintiff's option clause and plaintiff's clarification heretofore recited. And, therefore, since the word "contract" with the above interpretation allows substitution of other engine configurations during Step 2, the last clause of said paragraph 5, "shall not be altered without prior approval of the Contracting Officer," becomes superfluous.

We believe that our construction is the only fair construction. We have shown that the MEP unit was not ready for the implementation of the configuration management and control program. The directive of the Department of Defense of July 17, 1968, required implementation by the MEP unit within 90 days (by October 17, 1968); and with relation to "Procurement Aspects," it required that:

> * * * *Procurement planning and contract practices must be responsive to configuration management requirements.* [Emphasis supplied.]

The directive clearly placed a burden on the MEP unit to plan and adopt contract practices responsive to configuration management and controls. Furthermore, it was also clear from the directive that the position held by defendant's witness Joseph Sullivan, as project manager, was a position created by reason of the directive and his duties were as follows:

> 4. *Responsibility for Configuration Management.* DOD Components shall exercise their responsibility for configuration management by designating, for each CI [Configuration Item], an individual who is assigned the responsibility and delegated the authority for management of the item's configuration. For each CI for which system/project management is required in accordance with reference (d),

the individual designated shall be the system/project manager. * * *

His absence during the most critical period, when the minute details should have been worked out, did not help the MEP unit at all. He did not even read and check the LRFTP before it was issued. Had there been clear guidelines and better responsive contract practices provided, many of the difficulties in the present case may have been avoided.

It was not the intent of the directive to prejudice contractors who in good faith followed the directive and offered configuration management and control proposals in their respective technical proposals. This is especially so where the unit was not fully prepared to carry out the directive. The directive provided that the objectives of configuration management were:

> A. To assist management in achieving, at the lowest sound cost, the required performance, operational efficiency, logistics support and readiness of configuration items.
>
> B. To allow the maximum degree of design and development latitude yet introduce at the appropriate time the degree and depth of configuration control necessary for production and logistics support.
>
> C. To attain maximum efficiency in the management of configuration changes with respect to their necessity, cost, timing and implementation.
>
> D. To attain the optimum degree of uniformity in configuration management policy, procedures, data, forms and reports at all interfaces within the DOD and between DOD and industry.

The configuration management and control provisions in plaintiff's technical proposal were to carry out these basic, worthy Department of Defense purposes. Contract clauses are to be construed to effectuate the spirit and purpose of the clauses. *Petrofsky v. United States,* 488 F.2d 1394, 1399, 203 Ct.Cl. 347, 356 (1973); *Global Van Lines, Inc. v. United States,* 177 Ct.Cl. 829, 836 (1966). Our construction is in support of and in accord with the directive and its

purposes.[11] Plaintiff should be commended for its full cooperation with the MEP unit in effectuating the directive of the Department of Defense.

Upon the facts recited in the early part of this opinion, we find that defendant on July 29, 1970, unlawfully stopped and thereafter continued to stop plaintiff from substituting engines manufactured by Allis-Chalmers (Combination 4, Allis-Chalmers Model 11000—100 KW and Allis-Chalmers Model 25000—200 KW) for engines manufactured by Caterpillar (Combination 1, Cat. Model D33T—100 KW and Cat. Model D343TA—200 KW), even though plaintiff had the right to substitute during the Step 2 period Allis-Chalmers manufactured engines (Combination 4 aforementioned) under the contract. Defendant's action constituted a constructive change to the contract.

Therefore, under Count I (labeled "First Cause for Relief" in plaintiff's amended petition), we hold that plaintiff is entitled to recover and judgment under Count I is entered granting plaintiff's motion for summary judgment on the issue of liability. As for Count II (labeled "First Cause of Action" in the amended petition), in view of our granting relief under Count I, we deny relief under Count II.[12]

Defendant's motion for summary judgment under Count I is denied. In view of our denial of relief to plaintiff under Count II, defendant's motion for summary judgment under Count II is allowed.

Pursuant to Rule 149 of this court, further action in this court will be suspended for six months from this date to allow the parties to return to the ASBCA for calculation of the amount to which plaintiff is entitled under Count I by reason of defendant's constructive change in accordance with this opinion. Pursuant to Rule 149(f) and upon conclusion of the proceedings of the ASBCA, the plaintiff will report the result to the court and the parties will take further action for the final disposition of the case in this court.

DAVIS, Judge, concurring.

COWEN, Chief Judge, joins in the concurring opinion of Judge DAVIS and the opinion of Judge KASHIWA.

I do not disagree with the demonstration in the court's opinion that plaintiff retained the option to supply Allis-Chalmers engines, and therefore I join in that opinion. I would like, however, to expose an additional ground for reaching the same result.

Even if plaintiff was required by its contract to furnish Caterpillar engines, the record shows (and the Board of Contract Appeals found) that the contracting officer was entirely satisfied with the Allis-Chalmers engine except for the price reduction offered by plaintiff for the substitution of the latter engine. The plaintiff countered that it was willing to abide by the equitable adjustment to be determined under the Disputes clause. The Board ruled that "regardless of the prudence of such action" it was contractually permissible for the contracting officer to refuse to leave for later determination the amount of the reduction in the contract price. I do not think, however, that, where, as here, a procuring agency is fully satisfied with the qualities, workmanship, durability, etc. of a substituted product, it can reject the substitution simply because the price reduction offered by the contractor is in its view too small. The mechanism of the Changes and Disputes clauses provides a means for resolving

---

11. It was intimated by defendant at the trial before the ASBCA that plaintiff violates certain priorities in construing the contract. We are concerned with a Department of Defense directive which goes to the heart of the present case. The directive is paramount as compared to the priorities defendant points to.

12. A party cannot maintain a separate breach of contract action which seeks no relief further or different from that which was available to it under the contract. *L. W. Foster Sportswear Co. v. United States,* 405 F.2d 1285, 1287, 186 Ct.Cl. 499, 502 (1969); *Wm. A. Smith Contracting Co. v. United States,* 412 F.2d 1325, 1341, 188 Ct.Cl. 1062, 1091–92 (1969).

such a controversy solely over money. That mechanism should have been used when, as this record makes clear, price was the only matter displeasing to the Government.

In the circumstances of this case, I believe that this alternative position would lead to the same monetary result as that set forth in the court's opinion.