**DRAVO CORPORATION**

v.

**The UNITED STATES.**

**No. 39–72.**

United States Court of Claims.

July 13, 1973.

Davis, J., dissented and filed opinion in which Skelton and Bennett, JJ., joined.

Alexander W. Dann, Jr., Memphis, Tenn., Attorney of record for plaintiff. D. Jack Smith, Jr., of counsel.

Michael J. Rubin, Washington, D. C., with whom was Asst. Atty. Gen. Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge.

This case is before the court on plaintiff's motion for summary judgment and defendant's cross motion for summary judgment.

Plaintiff entered into a fixed price contract (No. DACWO 1–68–C–0088) with the Department of the Army on April 17, 1968, for the construction of the Jones Bluff Lock and Dam on the Alabama River in Alabama. Article 50 of the general provisions of the contract entitled "Value Engineering Incentive" provided that the contractor and the Government would share.in savings in the cost of performance of the contract which resulted from changes proposed by the contractor. On May 22, 1968, plaintiff submitted a proposal for a change in the design and construction of the cofferdam required by the contract along with a suggested adjustment in the contract price, not including any decrease in profit on the work originally included in the contract, which would now be deleted as the result of plaintiff's proposal. On September 25, 1968, the contracting officer informed plaintiff that its proposal was acceptable but that the decrease in the contract price must also include a decrease in plaintiff's anticipated profits. Plaintiff proceeded to do the work as changed, under protest. On May 9, 1969, the contracting officer rendered his final decision that a reduced profit must be reflected in the contract cost reduction. Plaintiff appealed this decision to the Corps of Engineers Board of Contract Appeals (The Board) on May 27, 1969. In a decision, Eng. BCA No. 3046, dated August 17, 1971, the Board upheld the decision of the contracting officer, stating that the decrease in costs under Article 50 was to be calculated as an equitable adjustment and thus elimination of some profits must be added to the eliminated cost to determine the adjusted price.

The parties are in agreement as to the facts of the case and the figures used in arriving at the cost reduction. They disagree only as to whether Article 50 calls for the calculation of profit as part of the cost savings. Thus, the controversy in this case centers around the varying interpretations of Article 50 of the contract, and therefore the court is faced with a pure question of law. We hold that the plaintiff is right, and the Board in error.

Plaintiff tells us that the language of Article 50 indicates that the amount of cost reduction must be calculated from the point of view of cost savings to the contractor. Therefore, profit should not be included in arriving at the amount saved. The court's attention is invited to the pertinent regulations involved, and to the administrative history of those regulations, all of which the plaintiff says supports its position.

Defendant tells us, to the contrary, that the only reasonable meaning that

can be given Article 50 is to read its provisions from the point of view of savings to the Government. Defendant argues that the pertinent regulations and their administrative history as they relate to fixed price contracts support its position. Finally, the defendant avers that the court should not depart from the usual method of calculating equitable adjustment under the circumstances of this case, and we are reminded that normally the calculation of equitable adjustment includes profit.

■ The objective in interpreting a contract is to determine the intention of the parties. The language of the contract must be given the meaning that would be understood by a reasonably intelligent person acquainted with the contemporary circumstances. Firestone Tire & Rubber Co. v. United States, 444 F.2d 547, 195 Ct.Cl. 21 (1971). All provisions of the contract should be read together and so as to make none inoperative, and specific provisions should be given precedence over general ones. Morrison-Knudsen Co. v. United States, 397 F.2d 826, 184 Ct.Cl. 661 (1968). If the contract is unambiguous its language should be implemented. Keco Industries v. United States, 364 F.2d 838, 176 Ct.Cl. 983 (1966), cert. denied, 386 U.S. 958, 87 S.Ct. 1027, 18 L.Ed.2d 105 (1967). As an aid to interpretation of the contract the pertinent ASPR should be inspected and the policy behind the promulgation of these regulations should be looked into. Firestone, Tire & Rubber, supra. Such regulations are law, binding on the contract parties, where applicable. Newport News Shipbuilding & Dry Dock Co. v. United States, 374 F.2d 516, 179 Ct.Cl. 97 (1967); Chris Berg, Inc. v. United States, 192 Ct.Cl. 176, 426 F.2d 314 (1970).

That portion of the contract which is at the center of controversy in this case is Article 50 of the General Provisions of the contract. That Article reads in pertinent part:

\* \* \* \* \* \*

50. VALUE ENGINEERING INCENTIVE (JUNE 1967) (*Applicable to all contracts in excess of $100,000*)

(a)(1) This clause applies to those cost reduction proposals initiated and developed by the Contractor for changing the drawings, designs, specifications, or other requirements of this contract. This clause does not, however, apply to any such proposal unless it is identified by the Contractor, at the time of its submission to the Contracting Officer, as a proposal submitted pursuant to this clause. \* \* \*

(2) The cost reduction proposals contemplated are those that:

(i) would require, in order to be applied to this contract, a change to this contract; and

(ii) would result in savings to the Government by providing a decrease in the cost of performance of this contract, without impairing any of the items' essential functions and characteristics such as service life, reliability, economy of operation, ease of maintenance, and necessary standardized features.

(b) As a minimum, the following information shall be submitted by the Contractor with each proposal:

(i) a description of the difference between the existing contract requirement and the proposed change, and the comparative advantages and disadvantages of each;

(ii) an itemization of the requirements of the contract which must be changed if the proposal is adopted, and a recommendation as to how to make each such change (e. g., a suggested revision);

(iii) an estimate of the reduction in performance costs, if any, that will result from adoption of the proposal, taking into account the costs of development and implementation by the Contractor (including any amount attributable to subcontracts

in accordance with paragraph (e) below) and the basis for the estimate;

(iv) a prediction of any effects the proposed change would have on collateral costs to the Government such as Government-furnished property costs, costs of related items, and costs of maintenance and operation;

\*   \*   \*   \*   \*   \*

(c)(1) Cost reduction proposals shall be submitted to the Procuring Contracting Officer (PCO). \* \* \*

(2) The Contracting Officer may accept, in whole or in part, either before or within a reasonable time after performance has been completed under this contract, any cost reduction proposal submitted pursuant to this clause by giving the Contractor written notice thereof reciting acceptance under this clause. Where performance under this contract has not yet been completed, this written notice may be given by issuance of a change order to this contract. Unless and until a change order applies a value engineering change proposal to this contract, the Contractor shall remain obligated to perform in accordance with the terms of the existing contract. *If a proposal is accepted after performance under this contract has been completed, the adjustment required shall be effected by contract modification in accordance with this clause.*

(3) If a cost reduction proposal submitted pursuant to this clause is accepted by the Government, the Contractor is entitled to share in instant contract savings, collateral savings, and future acquisition savings not as alternatives, but rather to the full extent *provided for in this clause.*

(4) Contract modifications made as a result of this clause will state that they are made pursuant to it.

(d) If a cost reduction proposal submitted pursuant to those clauses is accepted and applied to this contract, an *equitable adjustment in the contract price and in any other affected provisions of this contract shall be made in accordance with this clause and the "Termination for Convenience," "Changes," or other applicable clause of this contract.* The equitable adjustment shall be established by determining the effect of the proposal *on the Contractor's cost of performance,* taking into account the Contractor's cost of developing the proposal, insofar as such is properly a direct charge not otherwise reimbursed under this contract, and the Contractor's cost of implementing the change (including any amount attributable to subcontracts in accordance with paragraph (e) below). When the cost of performance of this contract is decreased as a result of the change, the contract price shall be reduced by the following amount: the *total estimated decrease in the Contractor's cost of performance* less fifty percent (50%) of the difference between the amount of such total estimated decrease and any net increase in ascertainable collateral costs to the Government which must reasonably be incurred as a result of application of the cost reduction proposal to this contract. *When the cost of performance of this contract is increased as a result of the change, the equitable adjustment increasing the contract price shall be in accordance with the "Changes" clause rather than under this clause,* but the resulting contract modification shall state that it is made pursuant to this clause. (JUNE 1967) \* \* \* (Emphasis supplied.)

\*   \*   \*   \*   \*   \*

Paragraphs (c)(2), (3), and (d) indicate that the Article is to be a mechanism by which the adjustment in price is to be implemented. Paragraph (d) clearly states that "an equitable adjustment in the contract price and in any other affected provisions of this contract *shall be made in accordance with this clause and the* 'Termination for Convenience', 'Changes', or other applicable clause of this contract". If the

paragraph stated that the adjustment should be made exclusively in accordance with the "Termination for Convenience" or the "Changes" clause then the rules which would apply to an equitable adjustment under those clauses would doubtless apply. However, here we are told that the adjustment shall be made in accordance with this clause as well as with the others, indicating that this adjustment in price is to be distinguished and different from one under those clauses. How it is to be distinguished is spelled out later in the same paragraph where it is stated that the adjustment be calculated as half "the total estimated decrease in the *Contractor's cost of performance*". This specific instruction how to calculate the adjustment preempts the usual general rules for computing equitable adjustments. It runs counter to an adjustment under other clauses of the contract which are based on the decrease in the Government's cost in getting the job done and thus clearly include a decrease in the contractor's profit. Paragraph (d) ends by setting out the procedure to be followed when there is an increase in the cost of performance as the result of the Article 50 change. In such circumstances "the equitable adjustment increasing the contract price shall be in accordance with the 'Changes' clause rather than under this clause". Of course, a 50–50 cost sharing is not prescribed in case of a cost increase. However, the language used in stating this further reflects that the method used in computing a downward price adjustment is an animal peculiar unto itself.

As stated above, when possible all language of the contract should be given an operative meaning and specific language should take precedence over general language. To apply only the "Changes" or "Termination for Convenience" procedures for adjustment would be to read out contract language of specific application to the question at issue, in favor of language of general application. Such an order of preference would be contrary to the rules of construction fol-

lowed by this court. The defendant invites the court's attention to the fact that "contractor's cost" is a phrase which also appears in the standard Changes and Changed Conditions Clauses yet those clauses trigger the usual rules for calculating equitable adjustment. It is clear, however, from those clauses that a change in the contractor's cost is only a condition precedent to their operation and not, as here, the stated basis of calculating what the adjustment should be. The comparison on the basis of the appearance of the phrase "contractor's cost" is simply inapposite.

The conclusion that the language of the Article in question spells out a method for adjustment which may differ from the usual equitable adjustment under the "Changes" or "Termination for Convenience" clauses of the contract and that this adjustment is to be based upon the contractor's cost of performance and therefore will not include profit, is supported by the relevant regulations. These regulations read in pertinent part:

Armed Services Procurement Regulations Involved (32 C.F.R. (1968))

*Subpart Q—Value Engineering*
§ 1.1701 *Policy.*

(a) Value engineering is concerned with the elimination or modification of anything that contributes to the cost of a contract item or task but is not necessary for needed performance, quality, maintainability, reliability, or interchangeability. Specifically, value engineering as contemplated by this part constitutes a systematic and creative effort, not required by any other provision of the contract, directed toward analyzing each contract item or task to ensure that its essential function is provided at the lowest over-all cost. Over-all cost may include, but need not be limited to, the costs of acquiring, operating, and logistically supporting an item or system.

(b) In order to realize fully the cost reduction potential of value engi-

neering, provisions which encourage or require value engineering shall be incorporated in all contracts, including letter contracts, of sufficient size and duration to offer reasonable likelihood for cost reduction. *All such provisions shall offer the contractor a share in cost reductions ensuing from change proposals he submits under such contracts.* While most proposals will result from the contractor's value engineering efforts, any proposal submitted by the contractor which meets the documentation and other requirements of the value engineering clauses may be rewardable. In addition, the value engineering provisions are intended to induce major prime contractors to encourage subcontractors to utilize value engineering techniques. Finally, to realize the cost reduction potential of value engineering, it is imperative that value engineering change proposals be processed by all parties as expeditiously as possible.

(c) In addition to the value engineering potential noted above (cost reductions resulting from contract change proposals), it is recognized that a contractor may develop a value engineering-type proposal with regard to a weapon system or end item for which he does not have a current contract, e. g., where the contractor originally developed and produced a weapon system, it is now operational, and the contractor no longer has a production or other contract therefor. In such a case, the value engineering proposal would not come within the provisions of this subpart. Nevertheless, it is desirable that the potential cost reductions resulting from unsolicited proposals not within the scope of value engineering clauses under current contracts be realized by the Government. Accordingly, nothing in this subpart shall be construed to preclude the purchase of unsolicited proposals on a case-by-case basis or other special contractual arrangements, pursuant to Subpart B, Part 9 of this chapter, or 10 U.S.C. § 2386, which are necessary to induce contractors to develop such proposals and make them available to the Government.

§ 1.1702 *Types of value engineering provisions.*

§ 1.1702–1 *Incentives.*

(a) A Value Engineering Incentive clause permits the contractor to share in cost reductions that ensue from change proposals he submits. Many types of contracts, when properly used, provide the contractor with an incentive to control and reduce costs while performing within the specifications and other contract requirements. However, *the practice of reducing the contract price (or fee in the case of cost-reimbursement type contracts) under the Changes clause tends to discourage contractors from submitting cost reduction proposals* requiring a change to the specifications or other contract requirements even though such proposals could be beneficial to the Government. *The objective of a value engineering incentive provision is to encourage the contractor to submit such cost reduction proposals.* To be acceptable, a value engineering change proposal must involve some change in the contract specifications, purchase description, or statement of work; this may include the elimination or modification of any requirements found to be in excess of actual needs in the areas of, for example, design, components, materials, material processes, tolerances, packaging requirements, technical data requirements, or testing procedures and requirements, and consequent reduction in the contract cost. Furthermore, even when the contract cost may be increased, the incentive provisions encourage contractors to submit value engineering change proposals that are likely to lead to overall savings resulting from significant net reductions in collateral costs of Government-furnished property, operational requirements or logistic support requirements.

\*　　\*　　\*　　\*　　\*　　\*

§ 1.1703 *Types of savings to be shared with the contractor.*

§ 1.1703–1 *General.*

(a) *One of the key problems in exploiting the very large cost reduction potential of value engineering is that of making contractual arrangements that give the contractor an effective incentive to perform value engineering successfully.* An effective incentive arrangement must include three principal elements: first, the contractor must be assured of a fair proportion of any savings realized by the Government as a result of his change proposal; second, he must be assured that this proportion will *be applied to a substantial base*; and third, he must be assured of an objective evaluation and expeditious processing of his change proposal. Sections 1.1703–2 through 1.1703–4 explain the various types of savings to be shared with the contractor and the different incentive arrangements to accomplish such sharing. Normally, the value engineering clause in a particular contract will provide for the contractor to share in savings realized on the instant contract on future acquisitions within a specified period of time, and in the area of reduced collateral costs.

(b) In choosing an appropriate incentive arrangement, *it is Department of Defense policy to provide the contractor with substantial financial incentives to undertake value engineering.* This policy reflects the premises that the Government will benefit from any value engineering savings, that definitely assured savings from successful value engineering are likely to be only a part of the overall savings, and that *a strong incentive tied to definitely assured savings will induce maximum contractor efforts to realize the full savings potential of value engineering.* (Emphasis supplied.)

The above regulations demonstrate an intent on the part of the authors that the contractors be encouraged to come forward with proposals which would lead to cost savings. The adjustment in the contract price under Article 50 was to be an inducement to the contractor. By § 1.1702–1(a) the Changes clause is rejected as a criterion to measure the price adjustment, and by § 1.1703(b) maximum incentives are the paramount consideration. It is consistent with this intent and policy that the contractor not be forced to accept a reduction in his expected profit partly offsetting his gain from sharing the cost-saving.

Of particular interest in respect to these regulations is that the authors of them were made aware of the fact that they could be construed to allow a contractor to retain all his expected profit. Prior to the enactment of the regulations they were submitted in draft form to various agencies for comment. The office of the Comptroller General in its comment stated that it appeared that under the regulations a contractor would be able to retain his expected profit on work that no longer would be done. It was recommended that further consideration be given to this point. The subcommittee which drafted the final language of the regulation considered this comment and explicitly stated in its memorandum to the ASPR Committee of February 13, 1967:

> Subcommittee Conclusion: In light of the basic intent of DOD's program to stimulate more aggressive value engineering-type efforts on defense contracts, this proposal of the C.G.— which, in effect, takes away part of one contractor payment (i. e., profit or fee) while at the same time making another (i. e., share in savings)—appears to be self-defeating. In addition, the C.G.'s characterization of the increased rate of fee or profit as "retention of profits unearned" is considered to be erroneous. The original profit agreed upon is a dollar figure designed to stimulate efficient contract performance; the contractor should not be penalized when he, in fact, demonstrates such efficiency by developing successful VE proposals. Recommendation rejected.

The subcommittee's conclusion was thereafter adopted by the full ASPR Committee.

Defendant is quick to point out, and correctly, that the Comptroller General's comment was directed to the Value Engineering Incentive Clause associated with Fixed-Price Incentive (Firm Target) Contracts and not the clause to be used in a Firm Fixed-Price Contract of the sort here at issue. However, it must be noted that the Comptroller General's comment as to the retention of profits was pertinent to both forms of contracts. It is therefore clear, that at the least the subcommittee was made aware by the Comptroller General's comment that the language criticized, which with variations was in the provisions proposed for several types of contracts, could be construed to allow retention of profit on work not done, and that it decided that it would be most consistent with the policy of the clause to reject the Comptroller General's recommendation.

It is of course obvious when one thinks about it that it is inimical to the achievement of contractor economy and efficiency to allow the idea to dominate, that his profit must be in some fixed ratio to his cost, whether the latter be great or small. We are dealing with a contract clause which on its face indicates that profit should not be reduced because the contractor discovers how to make the job less costly. The policy which underlies the regulations promulgated in connection with the clause demonstrates an intent to induce the cooperation of the contractor by making such cooperation economically attractive. And we are shown that the authors of these regulations were aware that contractors might retain expected profit under the regulations and specifically accepted such practice. By all approaches to contract interpretation it would appear that the plaintiff is in a strong position on the question of retention of expected profits.

Defendant, in support of the opposite conclusion, asserts that the clause calls for an equitable adjustment made in accordance with the clause itself and the "Changes" or "Termination for Convenience" articles and that "equitable adjustment" is a term of art which contemplates the inclusion of profit. The court's attention is invited to the discussion of equitable adjustment in General Builders Supply Co. v. United States, 409 F.2d 246, 187 Ct.Cl. 477 (1969). In *General Builders,* the court was faced with the provision of equitable adjustment in what was then a new default clause. Under the new clause, if the Government wrongfully terminated a contract the contractor could receive an equitable adjustment. The contractor in that case claimed the right to recover anticipated profits upon having a supply contract wrongfully terminated. In rejecting the contractor's claim the court stated in part 409 F.2d at p. 250, 187 Ct.Cl. at p. 482:

> \* \* \* "equitable adjustment" has become a term of art (in federal contracts) with a commonly understood meaning in the aspect involved in this case (*compare* Ambrose-Augusterfer Corp. v. United States, 394 F.2d 536, 545, 184 Ct.Cl. 18, 33 (1968)), and that accepted content should be followed unless there are very strong counterbalancing reasons. Such a counterweight might be a marked alteration in context, but if the change is not significant and drastic it should not be sufficient to alter the established meaning of this specialized term. \* \* \*

It is significant that in rejecting the contractors' claim in *General Builders* the court allowed for the possibility that under certain circumstances equitable adjustment might be given a different meaning. In the case at bar we have one of those circumstances, an alteration in context with a specific procedure telling how to determine the price adjustment based on the contractor's cost.

■ Defendant says that an equitable adjustment must be a fair adjustment and it is not fair for a contractor to re-

tain a profit on work he does not do. As a matter of contract interpretation, we have shown that the general principles of calculating an equitable adjustment are preempted here by the special provision stating how the computation is to be made. If defendant wants us to distort the plain meaning to effectuate our sense of fairness, or revise the contract because we deem it unconscionable, the answer is we cannot do these things to a contract legal when made; it is outside the judicial power. United States v. Bethlehem Steel Corp., 315 U.S. 289, 62 S.Ct. 581, 86 L.Ed. 855 (1942). That case is of special interest as it involves a "bonus for savings" in some ways similar to the clause here under review. Largely in response to this *Bethlehem* case, the Congress created the legislation to remedy the problem of excessive profits in defense contracting, now the Renegotiation Act of 1951, 50 U.S.C. App. § 1211 and ff. It could do so for this contract if so minded. Moreover, If it is in the eyes of some unfair to allow a profit on work not done, it may be replied that this sense of fairness leads to the calamitous cost plus a percentage of cost method of contracting, extensively discussed in the *Bethlehem* case. In the eyes of others, it is fair that the rare contractor who discovers a way to do the job in a less expensive way is entitled to as much profit, maybe more, as the contractor who runs up the cost beyond all reason. In the instant case, the sharing of the cost saving, under a fixed price contract, results in a profit increase for diminished work, no matter how the instant dispute is decided.

Accordingly, the plaintiffs' motion for summary judgment is allowed, and judgment is entered for the plaintiff in the stipulated amount of $5,696.00. Defendant's cross motion for summary judgment is denied.

DAVIS, Judge (dissenting):

As the court acknowledges at the end of its opinion, there is no question in this case of the plaintiff's being left with less gain than if it had performed the contract without the value engineering incentive change. It is bound (if its costs run according to plan) to have a greater profit, with respect to the deleted items, than if there had been no modification.[1] The sole issue here is the amount of that additional gain—over and above the sum the contractor expected to receive as profit on the omitted work—which the contractor may properly retain. Under both of the competing interpretations of the Value Engineering Incentive clause, plaintiff will be allowed to keep as profit a sum considerably greater than the amount of gain allocated to the deleted items; the controversy is over how much more profit plaintiff should have as a result of the cost-saving. The dispute, then, is simply between a greater and a somewhat smaller amount of a very considerable *added* profit.[2]

---

1. In this context I use the words "profit" and "gain" in their colloquial sense—an excess of receipts over costs and expenses. The ASPR Committee which drafted the various Value Engineering Incentive clauses made it clear that cost-savings payments to contractors under these provisions are to be excluded from the fee or profit paid under the contract for either statutory or administrative control purposes. They are payments for services in the same sense as profit is intended, partially, as compensation for the service of being efficient and reducing costs.

2. This is illustrated by the tables plaintiff itself uses in its brief: it is agreed the profit on the excised work would have been $11,392; according to defendant's calculation, the cost-savings to the Government amounted to $191,808 (including the profit item) and Dravo is entitled to half ($95,904); the contractor's computation is that the cost-savings to the contractor (excluding the profit) came to $180,028, of which plaintiff can retain half ($90,014) plus the originally-expected $11,392 profit (a total of $101,406). The simple comparison between $11,392, the profit Dravo would have made (on the deleted work) if the contract had been performed as originally written, and the competing figures of $101,406 or $95,904 shows that in either event plaintiff will have a very greatly enlarged profit allocable to the segment of the work cut out under the Value Engineering Incentive provision.

I stress this factor for two connected reasons. The first is that the decision of the case cannot comfortably be turned on the comparative "equity" or "fairness", from the monetary standpoint, of the contractor's or the Government's reading of the Engineering Incentive article. Under both, the contractor does very well, ending up with a much enlarged profit—and the increased expense to the Government from the contractor's interpretation is likely to be marginal at most. The second reason for emphasizing that, under both views, the contractor is left with a very substantial increased gain is that, as I see it, there is little ground for picking one interpretation over the other in order to encourage contractors to submit cost-reduction proposals; there seems an adequate profit spur whichever position is taken. Rather, the question before us should be answered primarily in terms of the wording of the clause, its general purpose, context, and history, as well as the impact of the relevant regulations.

Unlike the court, I do not find paragraph (d) of the article to be a clear directive. It commences with a square reference to "equitable adjustment", with that term's traditional exclusion of profit on work not done (General Builders Supply Co. v. United States, 409 F. 2d 246, 249–250, 187 Ct.Cl. 477, 482–483 (1969)). The paragraph also refers to the convenience-termination, changes, and other relief-granting clauses which use "equitable adjustment" in the same conventional sense the court now rejects. Like the changes and changed conditions articles, the second sentence of paragraph (d) links the "equitable adjustment" directly to the "Contractor's cost of performance", suggesting the comparability of the "equitable adjustment" under this clause with that authorized by the older provisions. This stress on "equitable adjustment" and the references to the other like clauses, in the first portion of paragraph (d), appear to me distinctly to braid this clause to the normal "equitable adjustment," and thus to favor the defendant's reading.

The only part of paragraph (d) supporting the contractor is the third sentence on which the court relies so heavily; without using "equitable adjustment",[3] that sentence says that the price shall be reduced, in effect, by 50 percent of the "total estimated decrease in the Contractor's cost of performance." Granting that there is a tension between that phraseology (reading it strictly and literally) and the rest of paragraph (d), I do not see that the third sentence is so specific and so unequivocal, in and of itself, that, without more, it must be understood as necessarily overriding the remainder of the paragraph. It is quite possible that this particular phrasing is merely an accident of draftsmanship, without special substantive significance. Further guidance must be sought from other sources outside of paragraph (d), which show the general purpose of the clause and the spirit in which it should be applied.

This was a fixed-price contract, let after formal advertising, and the dominant objective of the Value Engineering Incentive article in such an agreement is revealed by its paragraph (a)(2)(ii) which says that the cost reduction proposals contemplated are those that "would result in savings to the Government by providing a decrease in the cost of performance of this contract * * *." The emphasis is on the "savings to the Government" which can, of course, be accomplished only by a decrease in the initial fixed price. It is noteworthy, too, that the related reference is to the "cost of performance of this contract", which can mean the cost to the Government of the contractor's performance, not merely the contractor's own costs in the strict sense. The saving to the defendant appears to be the fundamental element.

The same note is sounded in the pertinent Armed Services Procurement Regu-

---

3. Of the four sentences in the paragraph, this is the only one not using "equitable adjustment".

lations. 32 C.F.R. § 1.1702–1 (1972) ("Incentives") says that to be acceptable a value engineering change proposal must invoke some modification with "consequent reduction in the contract cost", and even when the contract cost may be increased by a value engineering change the mechanism becomes operative if there are "overall savings" resulting from significant net reductions in collateral costs of Government-furnished property, etc. And § 1.1703–1, in discussing the types of savings to be shared with the contractor, declares that a contractor must be assured of a fair proportion "of any savings realized by the Government as a result of his change proposal", and also that the Defense Department policy reflects the premise that "the Government will benefit from any value engineering savings." The aim is to maximize the savings to the Government without dulling the contractor's incentive. That end is, I believe, reached by accepting the defendant's interpretation which leaves the contractor with plenty of incentive (as pointed out above) and at the same time gives the Government a greater over-all savings.[4]

Plaintiff rests upon, and the court invokes, a piece of "legislative" (or background) history which appears to be both too obscure for solid reliance and, as best I can understand it, wide of the mark. The clause involved in the relevant interchange between the Comptroller General and the ASPR committee was not the Value Engineering Incentive article for firm fixed-price agreements —the clause we have before us—but the separate articles for incentive-type contracts which contained quite different provisions for equitable adjustment for engineering incentive changes under those kinds of contracts. Those clauses called for increases in the target profit or the specified fees, and the General Accounting Office questioned whether those profits (and fees) should be increased even though the work was being reduced; in addition, the G.A.O. seems to have objected to the notion that the contractor should be allowed to retain any profit at all with respect to the work being deleted. The ASPR subcommittee rejected these G.A.O. criticisms in language I find quite cryptic[5] but which, on any reading, indicates on its face that the group was then considering only the incentive-type contracts (not the fixed-price form).

The majority of the court feels that the Comptroller General's comments are pertinent to the contract form we have here, as well as to the incentive type to which it was actually directed, but it is significant that the Comptroller General, though asked to comment on all the forms, did not make a similar observation as to the fixed-price clause now before us; apparently, he did not consider that provision to have the same vice. Conversely, the subcommittee's ambiguous remarks can be read as restricted to the incentive-type forms, or, as the court prefers, extended more broadly. In any event, insofar as the G.A.O. may have been proposing the complete elimination of all profit on the deleted work, the subcommittee's rejection would be consistent with the defendant's position

---

4. In this instance the parties have agreed upon the amount of profit allocable to the deleted work, but in the absence of such a stipulation there would be no more difficulty in calculating that amount than in an ordinary change decreasing work under the changes article.

5. For instance, the subcommittee seems to assume that there are two separate facets to distributing cost-savings to the contractor ((1) profit or fee; (2) share in savings) under the incentive-type clauses, but the texts of the provisions appear to contemplate that the contractor's share of the cost-savings will be distributed to him only through increases in his fee or profit. The short answer to the Comptroller General's objection is that, unless the profit (or fee) is increased, the contractor will not share at all in the cost-savings under this type of contract.

that half of the original profit should be retained. On the whole, I see this segment of the fixed-price Value Engineering Incentive article's background as too tenuous and infirm to ground any sturdy conclusions, one way or the other. Help must come from the other aids to interpretation.

In the end I remain with and apply the standard we set in *General Builders Supply Co., supra,* 409 F.2d at 250, 187 Ct.Cl. at 482–483: that "equitable adjustment" has become a term of art in federal contracts, with a commonly understood meaning with respect to profits, and "that accepted content should be followed unless there are very strong counterbalancing reasons." The only substantial "counterbalancing reason" I see here is the literal wording of the third sentence of paragraph (d) of the Value Engineering Incentive clause, and to my mind the impact of that phraseology is much diminished by the factors of, first, the wording of the rest of paragraph (d), second, the controlling purpose of the Value Engineering Incentive article to produce savings to the Government, and, third, the absence of any solid evidence that the drafters intended to depart from the normal understanding of "equitable adjustment." My conclusion is that the third sentence is not a "strong counterbalancing reason" but, rather, an accident of draftsmanship which is best understood by reading "the total estimated decrease in the Contractor's cost of performance" in slightly expanded form as "the total estimated decrease in the cost to the Government of performance by the Contractor." That is not a difficult transposition and it seems to me to fit better than the strict and literal construction.[6]

SKELTON and BENNETT, JJ., join in the foregoing dissenting opinion.

6. The *contra proferentem* canon is inapplicable because there is no showing, and no reason to believe, that plaintiff relied to its detriment, before controversy arose, on the interpretation of the Value Engineering Incentive article now espoused. See Young Associates, Inc. v. United States, 200 Ct.Cl. ——, ——, 471 F.2d 618, 620–621 (Jan. 1973).