AMERICAN ELECTRIC CONTRACTING CORPORATION

v.

The UNITED STATES.

No. 438–76.

United States Court of Claims.

June 14, 1978.

Joseph J. Ford, Washington, D. C., for plaintiff; H. Randall Bixler, Washington, D. C., attorney of record; Hudson, Creyke, Koehler, Tacke & Bixler, Washington, D. C., of counsel.

Arlene Fine, Washington, D. C., with whom was Asst. Atty. Gen., Barbara Allen Babcock, Washington D. C., for defendant.

Before COWEN, Senior Judge, DAVIS and KUNZIG, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's request for review by the court of the recommended decision of Trial Judge Philip R. Miller, filed August 24, 1977, pursuant to Rule 166(c), on plaintiff's motion and defendant's cross-motion for summary judgment, having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the decision as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is not entitled to recover. Accordingly, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted and plaintiff's petition is dismissed.

## OPINION OF TRIAL JUDGE *

MILLER, *Trial Judge* : Plaintiff sues for $51,784 in additional compensation claimed

---

* The trial judge's recommended decision and conclusion of law are submitted in accordance with Rule 166(c). The necessary facts are stated in the opinion.

to be due it under a contract with the Navy Department. It seeks to set aside a determination of the Armed Services Board of Contract Appeals (ASBCA) that defendant did not make constructive changes in the requirements of plaintiff's contract which would entitle plaintiff to an upward equitable adjustment in the contract price. The case is for decision on cross-motions for summary judgment.

On May 31, 1972, the Navy Department awarded to plaintiff a contract to upgrade aircraft carrier berthing facilities at the North Island Naval Air Station, San Diego, California, in the sum of $889,161. Only one aspect of the contract is in dispute, and that is the portion requiring the installation of a number of electric-power receptacles at pierside from which the ships may obtain electrical energy by plugging in electric cables. The contract specifications refer to them as hotel-power receptacles, because when navy vessels are berthed at piers they are considered to be floating hotels requiring power from shore to provide light and heat and to operate their equipment. The ships consume a great deal of electrical energy, and therefore the cables, plugs and receptacles are designed for transmission of up to 400 amperes through each. Even with 400 amperes per unit, large navy ships still require several cables to obtain the full amount of energy they need.

The portion of the specifications dealing with the receptacles reads:

15.1.1 Hotel power receptacles. 400 A, 480-volt, 3-phase, 3 pole, weatherproof, three-15 foot long single conductor 500 MCM extra-flexible pigtails potted into receptacle at the factor. * * * The 400-ampere receptacle shall conform to MIL–C–24368 * * *.

The specification referred to in the foregoing paragraph, MIL–C–24368, provides in pertinent part:

3.1 *Qualification.* The plugs, receptacles, and cabled receptacles furnished under this specification shall be products which are qualified for listing on the applicable qualified products list at the time set for opening of bids (see 4.3 and 6.3).

\* \* \* \* \* \*

4.3 *Qualification tests.*[1] Qualification tests shall be conducted at a laboratory satisfactory to the Naval Ship Engineering Center. Qualification tests shall consist of the in process inspection of 4.4.2 and the examination and tests of table III. [Table III sets forth a detailed list of tests and test methods.]

\* \* \* \* \* \*

6.3 With respect to products requiring qualification, awards will be made only for products which are at the time set for opening of bids, qualified for inclusion in applicable Qualified Products List QPL24368 whether or not such products have actually been so listed by that date. The attention of the suppliers is called to this requirement, and manufacturers are urged to arrange to have the products that they propose to offer to the Federal Government tested for qualification in order that they may be eligible to be awarded contracts or orders for the products covered by this specification. The activity responsible for the Qualified Products List is the Naval Ship Engineering Center, Department of the Navy, Center Building, Prince Georges Center, Hyattsville, Maryland 20782, and information pertaining to qualification of products may be obtained from that activity. Application for Qualification tests shall be made in accordance with "Provisions Governing Qualification SD–6" (see 6.3.1).

Attached to and made a part of this specification are drawings showing the arrangement of contacts for the receptacle; exact measurements are given for the contacts and the spacing between them. In each of the three phases of the receptacle there are to be seven contacts, making a total of 21. An accompanying drawing of

---

1. Application for qualification tests shall be made in accordance with "Provisions Governing Qualification SD–6" (see 6.3 and 6.3.1).

the plug designed to fit the receptacle similarly shows 21 contacts with measurements and arrangements identical to those shown for the receptacle, so that they can mate with each other. In the receptacle the contacts are called pins and in the plug the contacts are called sockets.

The qualified products list (QPL) dated November 5, 1971, which was in effect at the time set for bid openings, shows that the only manufacturer whose products had qualified was Viking Industries, Inc. (Viking), of Chattsworth, California.

The board found that at least 6 weeks before bid opening the official of the plaintiff company, who was responsible for preparing its bid, looked at the plans and specifications and obtained price quotations from several wholesalers. He received one quote for $325 per receptacle and two others for $750 each. Despite the differences in price he did not check as to the reasons for them, but assumed on the basis of his experience that any 400-ampere receptacle could not be worth more than $300 or $400 each and that the product covered by the low-quoted price would be acceptable.

On September 26, 1972, approximately 4 months after award of the contract, plaintiff submitted to the resident officer in charge of construction (ROICC) at San Diego, shop drawings and catalog sheets received from its wholesaler, the Electric Suppliers Distributing Company (ESD), for a 400-ampere electric receptacle manufactured by the Crouse-Hinds Company. Plaintiff supported its request to use Crouse-Hinds receptacles by a letter from ESD stating that it had assumed that a variety of manufacturers could meet MIL–C–24368 but it could locate none other than Viking which did so, and that it believed the Crouse-Hinds receptacles complied with the intent of the specification. Also attached was a certification from the Crouse-Hinds Company stating that its receptacle was functionally equivalent to the Viking connector in MIL–C–24368. However, at no time did plaintiff submit the Crouse-Hinds receptacle to a laboratory satisfactory to the Naval Ship Engineering Center (NAVSEC) for qualification testing as specified in MIL–C–24368.

On December 29, 1972, the ROICC refused to accept the Crouse-Hinds receptacle stating: "It has been determined that the Crouse-Hinds receptacles do not conform to the contract requirements and will not be approved. You are directed to furnish receptacles conforming to MIL Spec. MIL–C–24368. The only manufacturer known to conform to this MIL Specification is 'Viking.'"

Accordingly, plaintiff ordered and installed the Viking receptacles and later submitted a claim for $51,874, representing the asserted difference in cost between the Crouse-Hinds and Viking receptacles plus a cancellation charge levied by ESD. The claim was denied by the contracting officer.

Plaintiff relies on General Provision 9 of the contract, the standard of quality clause, which provides in pertinent part:

Unless otherwise specifically provided in this contract, reference to any equipment, material, article or patented process, by trade name, make, or catalog number, shall be regarded as establishing a standard of quality and shall not be construed as limiting competition, and the Contractor may, at his option, use any equipment, material, article, or process which, in the judgment of the Contracting Officer, is equal to that named.

Plaintiff also attempted to demonstrate to the board that the Crouse-Hinds receptacle is the "functional equivalent" of the Viking unit. Accordingly, plaintiff urged, the refusal of the contracting officer to permit the substitution amounted to a constructive change entitling it to an equitable adjustment under the standard changes clause.

The ASBCA found that the Viking receptacle had been developed by a subsidiary of the Lockheed Corporation (which had then been sold to Viking) in response to a specific need for a trouble-free plug receptacle for transmitting shore-to-ship power under the difficult environmental conditions found at navy piers. The Navy had encountered major problems in obtaining reliable plugs and receptacles for use on piers.

It claimed to have tested "every industrial-type receptacle that it had knowledge of" and while they operated satisfactorily in laboratory-controlled environments, none was sufficiently reliable under pier conditions. Crouse-Hinds receptacles had been used at the Norfolk, Virginia, naval base during the early 1960's, and many problems had been found during their use. The units would burn out; they would get so hot under continuous 400-amp operation that the parts would fuse together, making disengagement very difficult; the solder would melt and come out the back of the joints, resulting in the units being propelled 50-to-60 feet across the pier like cannonballs; and frequent repairs would be required. The cost of repairs became so great that the receptacles were sometimes bypassed and hazardous direct connections to the power sources were made. In other instances the units had to be derated from 400 amps to 300 amps, which meant that the vessels could not receive all the power which was needed, and could not, for example, operate radar gear or gun mounts. In addition, the combination of salt water and wide range of temperature changes on the piers resulted in early corrosion.

The prototype of the Lockheed unit was submitted to the Puget Sound Naval Shipyard in 1968, and was given realistic environmental testing which included rough handling, extremes of temperatures and operation in a corrosive atmosphere, and the Navy found that it satisfactorily met all requirements. As a result, on August 15, 1969, by MIL–C–24368 the Navy adopted the Lockheed plug receptacle configuration as the standard to be used for the ship-bulkhead connection for shore-to-ship power. After the specification was issued, Lockheed formally submitted its connector for qualification, and it was qualified and placed on the qualified products list. After Lockheed sold out to Viking, the latter submitted its product for QPL testing and qualification, and its product was substituted for that of Lockheed in 1971. In 1972 the connecting Viking plug specifications were made the standard of a related specification to go with the receptacle.

The board determined that since MIL–C–24368 was written around the Lockheed (or Viking) receptacle it called for a proprietary item. The board stated that it was not at all clear from the evidence whether or not the Viking design was patented. Although it found patent numbers stamped on a sample of the Viking receptable, it could only infer that "some or all of the Viking design features are patented." It did not find that another supplier could not manufacture a product which could meet the specifications and be qualified for the QPL without infringing on a patent. With respect to the Crouse-Hinds receptacle, the board found it could not meet the seven-pin requirement of the specification since it had only four pins, nor could it mate with the seven-socket plug, but it did not find how material this was; and it further stated that "since it was never submitted for qualification testing we do not know what other of the MIL–C–24368 features it did or did not meet." However, it concluded that the proprietary or restrictive nature of the specification was immaterial, since the Navy had the right to insist that plaintiff acquire the receptacles from a source timely qualified for listing on the QPL and plaintiff had not even attempted to so qualify the Crouse-Hinds receptacle.

The board noted that the Armed Services Procurement Regulations (ASPR) in effect at the time the contract was issued authorized the establishment of QPL's under certain circumstances and set forth procedures to be followed in their establishment and publication. It found that no evidence had been presented that the Navy had not followed such regulations in arriving at the conclusion that a qualified product would be needed, in the procedures for establishing the products list, or in publicizing its existence to all interested parties. In the absence of any contrary evidence the board presumed that those things which ASPR required to be done were done. Concerning General Provision 9 of the contract, the "standard of quality" clause which the contractor contended entitled it to furnish the Crouse-Hinds receptacle as the "functional

equivalent" of the Viking receptacle, the board held that the clause was inapplicable with respect to this product. By its own terms General Provision 9 provides that it is applicable "[u]nless otherwise specifically provided in this contract." The contract did otherwise specifically provide by setting forth in the specifications that the receptacle had to be one which had been tested and qualified for inclusion on the QPL by the Naval Ship Engineering Center prior to the time set for opening of bids. Since the Crouse-Hinds receptacle had never been submitted for qualifying testing by NAVSEC, the board ruled the issue of "functional equivalency" was not controlling, and it made no determination as to whether or not the Crouse-Hinds product was "functionally equivalent" to that of Viking.

With respect to plaintiff's contention that the contract did not give it notice that the receptacles were limited to those on the QPL, the board ruled that plaintiff's pre-bid interpretation of the specification was unreasonable.

Although the board found that in view of the introductory exception in General Provision 9 there was no conflict between that provision and the specification with its sole source QPL product, it ruled that if there were such a conflict plaintiff was obligated to seek clarification from the contracting officer before relying on its own interpretation of the conflicting language. Similarly, if the plaintiff believed that the specification was unduly restrictive, it should have followed the prescribed procedure for protesting such matters prior to entering into the contract.

In this court plaintiff makes three contentions. Since all raise questions of law, the prior administrative decision with respect to them is not binding on the court. 41 U.S.C. § 322; *Jack Stone Co. v. United States*, 344 F.2d 370, 373, 170 Ct.Cl. 281, 286 (1965).

First, plaintiff argues, it did not receive adequate notice in the contract that the receptacles to be supplied were those described in a qualified products list on which only one manufacturer, Viking, had qualified. Little weight can be given to this contention. The language of the contract must be given the meaning that would be understood by a reasonably intelligent person acquainted with the contemporary circumstances. *Dravo Corp. v. United States*, 480 F.2d 1331, 1333, 202 Ct.Cl. 500, 504 (1973); *Firestone Tire & Rubber Co. v. United States*, 444 F.2d 547, 551, 195 Ct.Cl. 21, 31 (1971). The specification was clear and unambiguous. It said that the hotel-power receptacle shall conform to MIL–C–24368, and the latter in turn stated clearly that the receptacle shall be a product which is qualified for listing on the applicable qualified products list at the time set for bid opening. The attention of prospective bidders was specifically called to the QPL requirement and they were told where they could get information regarding the QPL. If plaintiff was really unaware of the restrictive nature of the product specified it was only because of its own negligence, or because it chose to shut its eyes to the obvious.

After plaintiff's submittal of its plans to furnish the unqualified Crouse-Hinds receptacles was rejected, plaintiff's supplier had no difficulty in finding out that there was only one manufacturer's product on the QPL. As the board remarked, that information was equally as available before bidding as it was after and plaintiff could have ascertained it just as readily before bidding. Furthermore, even if it were not so obvious, a reasonably intelligent bidder would have been alerted before bidding to the possibility that he misunderstood the specifications when he solicited quotations from several wholesalers and received one bid for $325 per receptacle and two others for $750 each.

The fact that the contract did not physically incorporate the specifications and the QPL but only referred the bidder to them did not make it any less the bidder's responsibility to examine them. A "contractor cannot call himself misled unless he has consulted the relevant Government information to which he is directed by the contract, specifications, and invitation to bid.

\* \* \* [The contractor cannot] rest content with the materials physically furnished to him; he must also refer to other materials which are available and about which he is told by the contract documents." *Flippin Materials Co. v. United States*, 312 F.2d 408, 414, 160 Ct.Cl. 357, 367 (1963) (footnote omitted). And *see also Butler v. United States*, 551 F.2d 286, 290, 213 Ct.Cl. 379, 385–86 (1977); *Highway Products, Inc. v. United States*, 530 F.2d 911, 920, 208 Ct.Cl. 926, 942 (1976); *Hunt and Willett, Inc. v. United States*, 351 F.2d 980, 986, 168 Ct.Cl. 256, 265 (1964) and *L.M. Jones Co. v. United States*, 178 Ct.Cl. 636, 653–54 (1967).

Second, plaintiff contends that under the standard of quality clause it was entitled to furnish a functionally equivalent product in performance of the contract despite its failure to seek qualification of the product for the QPL prior to bid opening. In its brief plaintiff concedes that it "does not contend that a proprietary specification or a QPL requirement are, per se, improper." Nevertheless, the essence of its argument is that a QPL with only one name of a qualifying manufacturer on it is unduly restrictive, and because the purpose of the standard of quality clause is to encourage competition and to discourage potentially monopolistic practices and favoritism in government contract work, the standard of quality clause controls over an unduly restrictive QPL.

In support of its theory plaintiff cites *Jack Stone Co. v. United States, supra*, and *Sherwin v. United States*, 436 F.2d 992, 193 Ct.Cl. 962 (1971). However, neither of these cases stands for the proposition which plaintiff asserts, since neither involves a specification requiring prior testing and qualification for a QPL. The *Jack Stone* opinion does support plaintiff's statement as to the reason for the adoption of the standard of quality clause. However, the decision holds only that where a contract contains both a specification designating a product by brand name and the general standard of quality clause, the contract must be interpreted to permit the contractor to substitute equivalent equipment for the name-brand equipment. *Sherwin* holds that even if the specification does not refer to the product by its brand name but describes it in such a way that only one manufacturer can supply it, the standard of quality clause still permits the contractor to furnish an equivalent product rather than the proprietary one. Neither case holds that the standard of quality clause permits a contractor, who has agreed to supply equipment qualified for listing on a QPL after testing by an independent agency prior to bid opening, to supply an equivalent product without such prior testing and qualification because the QPL lists only a single brand.

■ It is settled that the Government is entitled to obtain precisely what it contracts for as long as it does not mislead the contractor. *Rixon Electronics, Inc. v. United States*, 536 F.2d 1345, 1351, 210 Ct.Cl. 309, 320 (1976); *Henry Spen & Co. v. United States*, 153 F.Supp. 407, 139 Ct.Cl. 613 (1957); *Farwell Co. v. United States*, 148 F.Supp. 947, 137 Ct.Cl. 832 (1957); *Octagon Process Inc. v. United States*, 141 Ct.Cl. 599, 604 (1958). Plaintiff advances no reason why this rule should not extend to pretested and qualified equipment if it is called for in the contract.

■ The issue is not one of a conflict between the standard of quality clause and a specification setting up a sole-source procurement. The specification did not refer to the receptacle by trade name, make or catalog number, but rather described the equipment in terms of design and performance requirements. By including the requirement for prior qualification testing, the Navy did not preclude substitution of any product equal to that described, as long as it was on the QPL or submitted for qualification prior to the time of bid opening. *See Consolidated Diesel Electric Co. v. United States*, 533 F.2d 556, 563, 209 Ct.Cl. 521, 535, 555 (1976). All that the QPL requirement did was impose a specific method by which it could be determined in advance that the equipment was, in fact, equal to that described in the specification.

The fact that only the Viking name was at that time included in the QPL was mere-

ly an indication that that company's item had previously been certified to meet the specification.[2] If, as plaintiff maintains, the Crouse-Hinds receptacle was as good and reliable as the Viking one and could otherwise meet the design and performance requirements of the specification, all the specification required it to do was to have its supplier or manufacturer submit the product to a NAVSEC-approved laboratory for testing prior to bid opening.[3] Having failed to do so not only prior to opening but at any subsequent time, it is hardly appropriate for plaintiff to claim now that it was entitled to substitute the Crouse-Hinds product as functionally equivalent without such testing.

Third, plaintiff maintains that the contract permitted it to furnish the Crouse-Hinds receptacle as functionally equivalent to the Viking product because the manner in which Government set up the specification and qualified products list was in violation of its own regulations. However, plaintiff has failed to demonstrate in what respects the regulations were violated.

ASPR §§ 1.1101–1.1111 provide the mechanics for promulgation and use of specifications based on qualified products lists. Such regulations prescribe precise justification for the use of prior qualification requirements in contract specification. Designated high officials of the various armed services must signify their approval.[4] The list must be made available extensively to prospective bidders and suppliers. Manufacturers must be urged to submit their products for qualification and where possible shall be given sufficient time to arrange for qualification testing prior to the issuance of the initial invitation for bids. Where the number of sources which have qualified are inadequate to provide competition, the contracting officer is to seek advice as to whether quality assurance other than prior qualification approval may be substituted in the procurement. Qualified products lists are to be limited generally to situations where it is necessary to test products in advance of procurement action.

The evidence in the record, discussed a pages 605–606, *supra*, shows that the Navy had great difficulty over many years in obtaining durable and reliable 400-ampere receptacles which would not corrode, deteriorate, burn out or fuse together when operated continuously at maximum capacity in all kinds of weather at its piers. Accordingly, when Lockheed, Viking's predecessor, at its own expense developed reliable, trouble-free, adequate plugs and receptacles for shore-to-ship power transmission, the Navy was justified, at least prima facie, in writing its specifications around the products which had been so developed for its needs and in preparing a QPL to insure that a receptacle made by any other manufacturer would be equally qualified in advance to do the same job, so that there would be no doubt by bidders as to what was required. The record is bare of evidence that the Navy failed to follow the proper procedures in establishing the QPL or that it was not

2. The board made no finding as to the reason why other manufacturers had not qualified for the QPL. However, the Chief of the Electrical/Electronics Design Branch at NAVSEC testified without contradiction that he invited both Crouse-Hinds and other manufacturers to make equipment that would qualify under the specification, but they declined when they found that the demand for the product was not sufficient to justify it.

3. As noted, plaintiff had 6 weeks between receipt of the invitation for bids and the bid-opening date. There is no allegation nor evidence in the record that this was inadequate for testing.

It is unnecessary to decide in this case what a contractor's recourse would be if the require-

ment of prior qualification testing was a subterfuge designed to disguise sole-source procurement unauthorized by the ASPR's, and his submission of a product for testing was rejected out-of-hand. Undoubtedly he could lodge a bid protest with the Comptroller General. It is also possible that he could sue to set aside the award. *Cf. Scanwell Laboratories, Inc. v. Shaffer*, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970); and he might be entitled to sue for bid preparation costs. *See Heyer Products Co. v. United States*, 147 Ct.Cl. 256, 177 F.Supp. 251 (1959) and *Keco Industries, Inc. v. United States*, 428 F.2d 1233, 192 Ct.Cl. 773 (1970).

4. For the Navy the use of a QPL in specifications is subject to the approval of the Chief of Naval Material (ASPR § 1.1103).

approved by the appropriate officials designated in the regulations. "Unless evidence to the contrary is produced, the law presumes that official actions are properly taken." *General Electric Co. v. United States*, 412 F.2d 1215, 1221, 188 Ct.Cl. 620, 629 (1969); and *see also Baldwin v. United States*, 175 Ct.Cl. 264, 271 (1966), *cert. denied*, 385 U.S. 1014, 87 S.Ct. 725, 17 L.Ed.2d 550 (1967).

In one respect, however, plaintiff properly points out, defendant failed to abide by its own regulations. The ASPR's provide:

§ 1.1107–2 Contract provisions.

\*    \*    \*    \*    \*    \*

(b) When qualified products are to be procured as components of end items, insert the following provision in the solicitation:

QUALIFIED PRODUCTS—COMPONENTS (DECEMBER 1969)

When any of the end items which are to be supplied to the Government by the Contractor will contain one or more components which are required by the applicable specification to be qualified products, such components shall have been tested and shall be qualified for inclusion in the Qualified Products List (whether or not actually included in the List) at the time of award of any subcontract by the Contractor for such components, or, in the event the Contractor plans to manufacture such components himself, shall have been so tested and have so qualified before the Contractor begins to manufacture such components for performance of this contract (not before manufacture of the prototype, preproduction model, or first article, for qualification testing). Unless required for interchangeability or compatibility, the Contractor shall not cite brand names from any Qualified Products List in any subcontract solicitation, but shall refer to the pertinent military specification so that optimum competition may be obtained. Delay resulting from the Contractor awaiting qualification approval by the Government of a component shall not constitute excusable delay when a previously qualified component could have been procured in time to meet the end item delivery schedule.

The Navy failed to include this clause in plaintiff's contract.

■ Defendant argues that plaintiff should be barred from raising this issue because it failed to make such omission an issue before the board  Ordinarily where a plaintiff fails to raise an issue before the administrative agency it may be precluded from raising it for the first time on court review of the agency decision. *Conrac Corp. v. United States*, Ct.Cl., 558 F.2d 994 decided July 8, 1977; *William F. Klingensmith, Inc. v. United States*, 505 F.2d 1257, 1265–66, 205 Ct.Cl. 651, 665 (1974). Because (despite plaintiff's effort to bring the omission somehow under the changes clause) it is not clear the board had jurisdiction to grant plaintiff any relief on the basis of this contention; because the issue is one of law not requiring additional proof; and because the case generally raises novel questions which should be decided on the merits, in the exercise of judicial discretion the issue is considered herein on the merits as an exceptional case. *Cf. Hormel v. Helvering*, 312 U.S. 552, 556–59, 61 S.Ct. 719, 85 L.Ed. 1037 (1941); *Pickering v. Board of Education*, 391 U.S. 563, n. 579, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *MacRae v. Commissioner of Internal Revenue*, 294 F.2d 56, 59 (9th Cir. 1961), *cert. denied*, 368 U.S. 955, 82 S.Ct. 398, 7 L.Ed.2d 548 (1962); and *see* 3 K. Davis, Administrative Law Treatise § 20.06 (1958; 1970 Supp.).

■ Plaintiff urges that the omitted clause is a required notice to the contractor that the receptacle is on a QPL, that the ASPR has the force and effect of law, and that when the Government failed to insert the QPL notice provision of ASPR 1.1107–2(b) the resulting contract was one which the Government was not authorized to make; and, therefore, "the General Provision 9 standard of quality was the appropriate test for compliance with the specification requirements."

In support of this argument plaintiff relies most heavily upon an unpublished rul-

ing of the Comptroller General to the Postmaster General dated August 1, 1962. The Postmaster General had rejected the lowest bid for a product because the military specification under which the product was advertised stated that the material furnished had to be one which had been tested, had passed the qualification tests and had been listed on the approved qualified products list; and since the lowest bidder was not listed on the approved QPL, its bid was considered as nonresponsive. The Comptroller General's opinion noted that paragraph 1–1.1101(b) of the Federal Procurement Regulations (41 C.F.R. (1971)) provided that when procurement of qualified products was to be made by formal advertising the following provision was to be inserted in the invitation for bids:

### QUALIFIED PRODUCTS

With respect to products described in this invitation as requiring qualification, awards will be made only for such products as have, prior to the time set for opening of bids, been tested and approved for inclusion in the qualified products list identified below. Manufacturers who wish to have a product tested for qualification are urged to communicate with the office designated below. Manufacturers having products not yet listed, but which have been qualified, are requested to submit evidence of such qualification with their bids, so that they may be given consideration.

The Comptroller General stated in his opinion:

As will be noted, the present regulation requires, in addition, notification in the invitation of the qualified product requirement. In our opinion, a bare indirect reference in an invitation to a military specification containing therein a qualified product requirement should not be regarded as an acceptable substitute for the requirements imposed by the quoted regulation. We believe such a failure to properly apprise all interested bidders of a requirement which, if not met, would cause rejection of their bids is not consistent with the free and open competition envisaged by the procurement statute. While we are not disposed at this late date to question the award made to Yankee, we do feel that corrective action should be taken to prevent a recurrence of this situation.

Although the clause in the Comptroller General's opinion is not identical with that in the present case, they do overlap. However, as this court pointed out in *John Reiner & Co. v. United States*, 325 F.2d 438, 440, 163 Ct.Cl. 381, 386 (1963), *cert. denied*, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964), what plaintiff overlooks is the differences in the roles played by the Comptroller General and the court—

Because of his general concern with the proper operation of competitive bidding in government procurement, [the Comptroller General] can make recommendations and render decisions that, as a matter of procurement policy, awards on contracts should be cancelled or withdrawn even though they would not be held invalid in court. He is not confined to the minimal measure of legality but can sponsor and encourage the observance of higher standards by the procuring agencies. Courts, on the other hand, are restricted, when an invitation or award is challenged, to deciding the rock-bottom issue of whether the contract purported to be made by the Government was invalid and therefore no contract at all—not whether another procedure would have been preferable or better attuned to the aims of the competitive bidding legislation. [Footnote omitted.]

And *see also Wheelabrator Corp. v. Chafee*, 147 U.S.App.D.C. 238, 245–48, 455 F.2d 1306, 1313–16 (1971).

What is significant is the fact that in the cited opinion the Comptroller General, despite his criticism of the omission of the required clause, was not disposed to question the validity of the award. If the Comptroller General thought that a contract for supply of a qualified product was not invalidated by the omission of a qualified products clause when the contractor had other notice to similar effect in the

specifications, his opinion can hardly be persuasive that his court is required to invalidate the contract under similar circumstances here. Moreover, plaintiff does not seek rescission of the contract in this case. It only asks the court to remake the contract to provide other than what the parties agreed.

Accepting the plaintiff's argument that ASPR § 1.1107–2(b) has the force and effect of law [5] and that the contracting officer was required by such regulation to insert in the contract the clause contained in that section, what follows from the defendant's violation of that requirement? Is plaintiff entitled to recovery for a constructive change in the contract as if the specification gave no notice at all that it was a restrictive specification and that the product had to be on the qualified products list?

In *Rough Diamond Co. v. United States*, 351 F.2d 636, 173 Ct.Cl. 15, (1965), *cert. denied*, 383 U.S. 957, 86 S.Ct. 1221, 16 L.Ed.2d 300 (1966), the court had occasion to consider the question of whether or not one who voluntarily entered into a contract with the Government without being deceived as to the facts was thereafter entitled to damages or a reformation of the contract because the Government had failed to follow a statute providing for a different method of computing the contract price which was more advantageous to the plaintiff. The plaintiffs there entered into a contract with the Department of Agriculture in which plaintiffs agreed to barter industrial diamonds for surplus cotton owned by the Government. Although the statute authorizing the transaction provided that the cotton should be disposed of at world-market price, the Government insist-

ed on a barter price in excess of world-market. The court held that since the congressional purpose in enacting the statute under which the contract was negotiated was to protect American farmers and not the parties to the barter contracts, the plaintiffs were bound by their agreement to pay for the cotton at the higher rate with full knowledge of the surrounding circumstances and without deception, despite the Government's violation of the law in fixing the rate.

The same rule has been applied to violations of regulations. In *Hartford Accident & Indemnity Co. v. United States*, 127 F.Supp. 565, 130 Ct.Cl. 490 (1955), a surety which completed performance of contracts on which its principals had defaulted, complained against the assessment of liquidated damages for late completion pursuant to the terms of the contract, on the ground that the contract terms were in breach of a regulation requiring the use of a standard form of contract under which liquidated damages could not be assessed against a completing surety. The court denied recovery to the plaintiff on the ground that (127 F.Supp. at 567, 130 Ct.Cl. at 493–94): "since the regulations were promulgated for the benefit of the Government, and not for the benefit of any one else, the other party to the contract cannot complain that the regulations were not complied with." [6] And *see also KECO Industries, Inc. v. United States*, 492 F.2d 1200, 1206, 203 Ct.Cl. 566, 578 (1974); *National Electronic Laboratories, Inc. v. United States*, 180 F.Supp. 337, 148 Ct.Cl. 308, 314, 340 (1960); *Centex Construction Co. v. United States*, 162 Ct.Cl. 211, 221 (1963).

---

**5.** *G. L. Christian & Associates v. United States*, 312 F.2d 418, 424, 426, 160 Ct.Cl. 1, 12, 15, *rehearing denied*, 320 F.2d 345, 160 Ct.Cl. 58, *cert. denied*, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963); *Chris Berg, Inc. v. United States*, 426 F.2d 314, 317, 192 Ct.Cl. 176, 182 (1970); *Condec Corp. v. United States*, 369 F.2d 753, 757–58, 177 Ct.Cl. 958, 966–67 (1966).

**6.** *Compare Perkins v. Lukens Steel Co.*, 310 U.S. 113, 129, 60 S.Ct. 869, 877, 84 L.Ed. 1108 (1940):

> [P]rospective bidders for contracts derive no enforceable rights against the agent for an erroneous interpretation of the principal's authorization. For erroneous construction of his instructions, given for the sole benefit of the principal, the agent is responsible to his principal alone because his misconstruction violates no duty he owes to any but his principal.

The case of *Chris Berg, Inc. v. United States, supra,* does not state or apply a contrary rule. There it was held that an ASPR giving a defense contractor a right to reform his low bid to correct a mistake in calculations prior to award was intended for the benefit of the contractor rather than the Government and thus entitled him to reformation of the contract so as to increase the amount of the contract price.

Examination of the clause from ASPR 1.1107–2(b), sentence-by-sentence, indicates that it was primarily for the benefit of the Government and not for the benefit of the plaintiff. The first sentence states that when end items to be supplied by the contractor contains components which are required by the applicable specifications to be qualified products, such components shall have been tested and qualified at the time of award of any subcontract by the contractor for such components; and, if the contractor plans to manufacture such components himself, they shall have been so tested and qualified before the contractor begins to manufacture such components. The sentence does not notify the contractor that there is in fact any particular component which is required by the specification to be a qualified product. It is the specification itself which does that. The intent of this sentence is obviously to set a time limit on qualification so that the contractor does not claim excusable delay. This is reinforced by the last sentence discussed, *infra.*

The second sentence states that in soliciting subcontracts the contractor is to refer to the pertinent military specification rather than to cite brand names from any QPL, so that the Government may obtain the benefit of optimum competition. Indirectly, of course, this benefits potential subcontractors by encouraging their bidding. However, it is difficult to see how this sentence can benefit the plaintiff, who is the prime contractor. The last sentence warns the contractor that the failure to obtain timely qualification approval by the Government of a component shall not constitute excusable delay when a previously qualified component could have been procured in time. Again, this is clearly for the benefit of the Government.

Equally important is the fact that plaintiff was not injured by the omission. The military specification plainly gave the plaintiff adequate notice that the receptacle was on the qualified products list referred to in the specification. The record discloses that plaintiff is an experienced government contractor; indeed, most of its business is done with the Government. If plaintiff believed the military specification to be improperly proprietary or unduly restrictive because a particular requirement contained in the ASPR was not followed when the solicitation for bids was originally issued, it should have raised this issue in a bid protest prior to award. Plaintiff apparently did not believe that the absence of the provision in ASPR § 1.1107–2(b) was sufficiently important to even raise it before the Board of Contract Appeals.

To allow plaintiff to bid, obtain the award and the contract as the lowest bidder, and only after beginning performance claim additional compensation on the ground that there was a procedural irregularity by the Navy in following its regulations prior to the award, would tend to undermine the fairness of the competitive bidding process. A contractor who was aware of the procedural irregularity would be able to submit a lower bid than his competitors on the assumption that if he raised the irregularity after he received the award he would receive additional compensation even if the total made his bid higher than those of his competitors. In addition, the procedural omission would permit him to extricate himself from specifications found to be more difficult or costly than originally anticipated. Plaintiff should be held to its voluntary contract commitment.

## CONCLUSION

Plaintiff's motion for summary judgment is denied; defendant's cross-motion for summary judgment is granted; and the petition is dismissed.